**William Arthur SAKEAGAK, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–6293.

Court of Appeals of Alaska.

Jan. 9, 1998.

Publication Ordered Jan. 14, 1998.

---

Rebecca K. Wright, Assistant Public Defender, Barrow, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and MANNHEIMER and STEWART, JJ.

MANNHEIMER, Judge.

William Arthur Sakeagak was convicted of first-degree murder, AS 11.41.100(a)(1)(A), and sentenced to 99 years' imprisonment. He appeals his conviction, arguing that three of the trial judge's evidentiary rulings were mistaken. Sakeagak also appeals his sentence; he argues that the judge was mistaken in finding that the victim was particularly vulnerable, and he further asserts that his 99–year sentence is excessive. We affirm.

At approximately 9:20 p.m. on Sunday, October 22, 1995, North Slope Borough police officers arrived at Quonset Hut 267A at the Naval Arctic Research Laboratory (NARL) outside of Barrow. They came to investigate the report of a possible death. The officers arrived to find Sakeagak kneeling over the body of his wife, Judy.

It was evident to the officers that Judy Sakeagak was dead. Rigor mortis had begun to set in, and the extremities of Ms. Sakeagak's body were already cool to the touch (although the body core was still warm).

William Sakeagak's breath smelled of alcoholic beverages, but he was responsive to questions and seemed to be in control of his faculties. Sakeagak told the officers that he had left home around 7:15 that evening (that is, approximately two hours before), and that Judy had been alive, sitting in the living room, when he left. According to Sakeagak, he returned home at 9:15 (just a few minutes before the officers arrived) and discovered his wife collapsed in the bedroom.

Sakeagak told the officers that, a week before, his wife had begun to suffer a heart condition. The officers noticed that there were several bloodstains in the bedroom, in the bathroom, and on Sakeagak's clothes. When asked about these bloodstains, Sakeagak first said that he didn't know where the blood had come from; later, he said that his wife had been suffering spontaneous nosebleeds.

As just explained, when Sakeagak was asked to describe his movements that Sunday evening, Sakeagak said that he had left his house around 7:15 and had returned around 9:15. Sakeagak told the officers that, during these two hours, he first visited the Recreational Center at NARL and then he took a bus into Barrow, where he went to a store and purchased soda and cigarettes. He then returned home.

The police later discovered that Sakeagak's account of his whereabouts did not match the bus schedule. On Sunday evenings, only two buses departed Barrow for NARL; one left at 5:40 p.m. and the other left at 9:40 p.m. The bus trip takes 15 minutes: that is, the earlier bus arrived at NARL at 5:55, while the later bus arrived at 9:55. If the buses were on time that evening, Sakeagak could not have taken the bus from Barrow and returned to NARL shortly after 9:00 as he claimed. Moreover, the police also found out that the NARL Recreational Center was closed on Sundays.

The medical examiner conducted an autopsy and concluded that Judy Sakeagak had died as a result of manual strangulation. Given the condition of the body when it was discovered, the medical examiner concluded that Judy Sakeagak had probably been dead for several hours when the officers arrived (at 9:20 p.m.). This information cast doubt on Sakeagak's claim that his wife had been alive when he left the house at around 7:15 that evening.

Upon receipt of the autopsy report, Sergeant Venable (one of the investigating officers) re-interviewed Sakeagak. During this second interview, Venable told Sakeagak that it appeared Judy did not die of natural causes, and that Sakeagak was responsible for her death. However, Venable did not tell Sakeagak that the medical examiner had concluded that Judy was strangled. Sakeagak eventually told Venable that he and Judy had fought on the evening of her death. Sakeagak said that, while he was pushing his wife down onto the bed, he had pulled on her arm while the arm was wrapped around her neck—suggesting that Judy had strangled by accident. At the ensuing trial, the medical examiner testified that he thought this explanation of the death was highly dubious—that it was essentially impossible for "a healthy person to put their own arm around their neck in a way that could cause them to become injured."

A Barrow jury convicted Sakeagak of first-degree murder. Superior Court Judge Michael I. Jeffery sentenced Sakeagak to 99 years' imprisonment.

*The Evidentiary Rulings*

At trial, during the government's direct examination of Sgt. Venable, the prosecutor played a tape recording of Venable's interview with Sakeagak (the one that took place after Venable received the medical examiner's report). Before the prosecutor played the tape for the jury, the following exchange occurred:

PROSECUTOR: Investigator Venable, I'm going to play this whole tape for the jury, but before we listen to it, I want to give the jury a "heads up" on how the interview was conducted. Could you explain how the interview was conducted?

VENABLE: Yes, sir. I brought Mr. Sakeagak ... to the office. The first thing that I did was tell him that Judy was killed and it wasn't—it wasn't natural causes. The second thing I informed him of is the fact that—that he was responsible for the death.

PROSECUTOR: Okay. And basically, throughout that interview, you confronted him with those kinds of statements.

VENABLE: Yes, sir.

PROSECUTOR: Okay. And why did you [conduct] this interview as such a confrontational interview?

VENABLE: Because I felt that he was responsible for her death.

Defense counsel objected to Venable's last answer, as well as to the playing of the parts of the taped interview where Venable told Sakeagak (falsely) that the medical examiner had concluded that Sakeagak was responsible for his wife's death.

Judge Jeffery concluded that Venable's in-court answer was admissible to show why the officer had "adopted that particular investigative style" during the interview. As for Venable's false assertions to Sakeagak during the taped interview that the medical examiner had concluded that Sakeagak was responsible for his wife's death, Judge Jeffery allowed Sakeagak's attorney to conduct a voir dire examination of Venable (in the presence of the jury) before the tape was played. During this voir dire, Venable conceded that these statements to Sakeagak were simply part of his interview strategy,

and that the medical examiner had not identified Sakeagak (or any other individual) as being responsible for Judy Sakeagak's death.

On appeal, Sakeagak contends that Judge Jeffery's ruling essentially allowed Venable to inform the jury of his personal opinion that Sakeagak was guilty. Relying on *Flynn v. State*, 847 P.2d 1073 (Alaska App.1993), Sakeagak argues that this testimony deprived him of a fair trial. We disagree.

■ There was no chance that the jury would misapprehend the import of the statements Venable made during the taped interview concerning the autopsy results (his assertions to Sakeagak that the medical examiner had identified Sakeagak as the person responsible for his wife's death). When the defense attorney conducted the voir dire examination of Venable before the tape was played, Venable readily conceded that these assertions were false—that the medical examiner had not identified any individual as being responsible for Judy Sakeagak's death. Venable explained that he told this lie to Sakeagak in order to prompt him to confess.

■ Regarding Venable's answer, "I felt that he [Sakeagak] was responsible for her death", the admissibility of this testimony is more debatable. The issue is one of weighing probative force against potential for unfair prejudice under Evidence Rule 403.

■ As the prosecutor suggested, and as Judge Jeffery ruled, Venable's opinion that Sakeagak had probably killed his wife does tend to explain the confrontational tone that Venable adopted during the interview. However, Venable's interview strategy was not the subject of major dispute at trial; Sakeagak did not assert that he was confused or coerced by the confrontational style that Venable adopted during the interview. Although Venable's suspicions of Sakeagak's guilt may have been relevant to explaining his interview strategy, *see* Evidence Rule 401, Venable's choice of interview strategy had little importance to the decision of Sakeagak's case.

The remaining term of the equation is the potential of Venable's testimony to create unfair prejudice. In *Flynn*, 847 P.2d at 1075–76, and in *Thompson v. State*, 769 P.2d 997, 1003–04 (Alaska App.1989), this court recognized and applied the rule that witnesses are not allowed to give their personal opinions of the defendant's guilt or innocence. In *Flynn*, we recognized the particular danger of allowing police officers to give their opinion that the defendant is guilty. True, jurors are generally instructed that they are not bound by the testimony of any witness, and that they are obliged to decide the case for themselves. Nevertheless, jurors may surmise that the police are privy to more facts than have been presented in court, or they may be improperly swayed by the opinion of a witness who is presented as an experienced criminal investigator.

Under the facts of this case, however, the risk was small that Venable's answer would prejudice the fairness of Sakeagak's trial. Unlike the police officer in *Flynn* (who told the jury that he had never seen an innocent person confess), Venable did not purport to be a "human polygraph". Venable merely testified that, when he went to interview Sakeagak the second time, he believed that Sakeagak was responsible for his wife's death.

The evidence at trial showed that, at the time of that second interview, Venable was aware of the autopsy results (which revealed that Judy Sakeagak had been strangled), and Venable was also aware that Sakeagak's account of his movements and actions on the evening of his wife's death was almost certainly false. In view of this evidence, it is quite unlikely that the jury was left wondering about the basis of Venable's suspicions.

As in *Walker v. State*, 674 P.2d 825, 831–32 (Alaska App.1983), we conclude that Venable's explicit statement added nothing of substance to an inference the jury could easily draw for themselves. "[T]he basis for [Venable's] conclusion and the possible lack of evidence to support that conclusion [were] before the jury". *Id.* at 832. Because the testimony had some relevance, and because the potential for unfair prejudice was negligible, we conclude that Judge Jeffery did not abuse his discretion when he overruled Sak-

eagak's objection to this testimony. *Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980).

Sakeagak next contends that Judge Jeffery should not have allowed the State to introduce certain statements that Sakeagak made concerning his wife's purported premonitions of death and the preparations she purportedly made for her own funeral.

At trial, the State presented evidence that, a few days after Judy Sakeagak's death, Sakeagak had a conversation with a family friend, Ransom Agnassaga. Sakeagak told Agnassaga that Judy had been having chest pains for some time. He also told Agnassaga that, during the week before her death, Judy had had premonitions of death: she had selected the Bible verses to be read at her funeral, and she had purchased the dress in which she wished to be buried.

Sometime after this conversation, Agnassaga and his wife went to Sakeagak's house to pick up the funeral dress. However, when Sakeagak showed them the dress, Agnassaga and his wife recognized that the dress was not newly-purchased: it was the dress that Judy had worn to the Agnassagas' wedding five years before.

Sakeagak's attorney objected that this testimony was purely character evidence, and therefore unfairly prejudicial, because its only relevance was to suggest that Sakeagak was a liar. The prosecutor responded that Sakeagak's lies demonstrated his consciousness of guilt. Judge Jeffery ruled that the probative value of the testimony outweighed its potential prejudicial effect. The defense attorney refused Judge Jeffery's offer to give the jury a limiting instruction; the attorney asserted that the prejudicial effect of the testimony could not be cured.

On appeal, Sakeagak concedes that he lied to Agnassaga, but he argues that evidence of his lies should have been excluded because it was not relevant, and because its only effect was to show that Sakeagak was a person of bad character—a liar who perhaps did not take his wife's death seriously. We disagree.

■ If evidence of Sakeagak's lies had been offered simply to show that Sakeagak was a person of questionable character, the evidence would have been inadmissible. *See*

Alaska Evidence Rules 404(a) and 404(b). However, this was not the case. Sakeagak's false statements to Agnassaga were relevant because, potentially, they showed that Sakeagak was consciously attempting to mislead Agnassaga about Judy's death—attempting to falsely portray her death as the result of pre-existing illness or physical condition. From such deliberate falsehoods, the jury could infer that Sakeagak was conscious of his own guilt. Additionally, such lies were evidence that Sakeagak had acted with the culpable mental state required for first-degree murder.

Sakeagak suggests that there might be other explanations for Sakeagak's decision to lie about what his wife did and said in the days preceding her death. In particular, Sakeagak suggests that his statements might have been the product of extreme grief, an attempt to cope with the recent loss of a loved one. However, the fact that there are other plausible interpretations of the evidence does not negate the relevance of that evidence to evince Sakeagak's consciousness of guilt. Sakeagak's arguments go to the weight of the evidence—a determination for the jury—rather than its relevance. *See Charles v. State*, 780 P.2d 377, 383 (Alaska App.1989); *Dyer v. State*, 666 P.2d 438, 449 (Alaska App.1983); *Elson v. State*, 659 P.2d 1195, 1201 (Alaska 1983) (when a defendant's conduct can reasonably be interpreted as inculpatory, alternative explanations of the defendant's conduct "go to the weight rather than the admissibility of the evidence"). *See also United States v. Newman*, 6 F.3d 623, 628 (9th Cir.1993) (holding that a defendant's false exculpatory statements were circumstantial evidence of the defendant's consciousness of guilt).

■ When Sakeagak objected to this evidence, Judge Jeffery complied with the mandate of Evidence Rule 403 by weighing the potential prejudicial effect of the evidence against its probative value. The judge determined that this evidence was relevant for purposes other than to show Sakeagak's character, and that it was more probative than prejudicial. Sakeagak has failed to convince us that this ruling was an abuse of discretion.

*The Sentencing Issues*

■ We now turn to Sakeagak's sentencing issues. Sakeagak was found guilty of first-degree murder. The presumptive sentencing laws do not apply to first-degree murder; a sentencing judge has the authority to impose any sentence within the range of imprisonment for this offense (20 years to 99 years). AS 12.55.125(a). However, even though the aggravating and mitigating factors codified in AS 12.55.155(c) and (d) do not apply to first-degree murder, the parties used these factors as points of reference at Sakeagak's sentencing when they argued how Sakeagak's offense should be viewed in comparison to a typical first-degree murder. We have approved this practice in similar circumstances. *See Gregory v. State,* 689 P.2d 508, 509 (Alaska App.1984) (approving a judge's consideration of the statutory aggravators and mitigators in a second-degree murder sentencing).

■ The State argued that Sakeagak's offense should be deemed more than typically serious because Sakeagak knew that Judy Sakeagak was quite intoxicated at the time of her death, and thus particularly vulnerable to Sakeagak's assault. (Judy's blood-alcohol level at the time of her death was .249 percent.) See AS 12.55.155(c)(5), which declares that an offense is aggravated if "the defendant knew or reasonably should have known that the victim of the offense was particularly vulnerable or incapable of resistance due to advanced age, disability, ill health, or extreme youth[,] or was for any other reason substantially incapable of exercising normal physical or mental powers of resistance". Judge Jeffery agreed with the State that this factor was present in Sakeagak's case.

■ Sakeagak argues that aggravator (c)(5) does not apply to victims who are rendered particularly vulnerable by intoxication. He relies on AS 12.55.155(g), which declares, "Voluntary alcohol or other drug intoxication . . . may not be considered an aggravating or mitigating factor." When Sakeagak presented this argument to Judge Jeffery, the judge concluded that AS 12.55.155(g) was intended to bar a sentencing judge from finding aggravators or mitigators based on the *defendant's* intoxication, but that AS 12.55.155(g) was not intended to bar a judge from considering a victim's intoxication when determining the disabilities described in AS 12.55.155(c)(5). We agree.

■ While the wording of AS 12.55.155(g), considered by itself, might support Sakeagak's argument, we must interpret the various parts of AS 12.55.155 as a whole. The guiding principle of statutory construction is to ascertain and implement the intent of the legislature. When a statutory provision is part of a larger framework, even seemingly unambiguous language must be interpreted in the context of the other portions of the statute. *Millman v. State,* 841 P.2d 190, 194 (Alaska App.1992).

AS 12.55.155(c)(5) authorizes increased sentences for defendants whose victims are "for any . . . reason substantially incapable of exercising normal physical or mental powers of resistance". The statute specifically mentions victims whose incapacity is due to ill health, and this court has interpreted the statute to apply to victims who are substantially incapable of resistance because they are asleep. *See Wassillie v. State,* 911 P.2d 1071, 1073 (Alaska App.1996). Given the obvious legislative policy behind aggravator (c)(5), it is simply unreasonable to interpret aggravator (c)(5) as not authorizing increased sentences for defendants whose victims are substantially incapacitated by intoxication. Sakeagak offers no plausible reason why the legislature might have wanted to limit the scope of aggravator (c)(5) in the manner he suggests.

Sakeagak's final contention is that his 99-year sentence is excessive. This is the maximum sentence for first-degree murder, and Sakeagak relies on cases holding that "maximum sentences . . . should not be imposed without some foundation for characterizing a defendant as the worst type of offender." *State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975), quoting *Galaktionoff v. State,* 486 P.2d 919, 924 (Alaska 1971).

■ However, a finding that a defendant is a "worst offender" can be based on the nature and circumstances of the defendant's present offense, or on the defendant's criminal history, or both. *Hintz v. State,* 627 P.2d

207, 210 (Alaska 1981); *Moore v. State*, 597 P.2d 975, 976 n. 4 (Alaska 1979); *Saganna v. State*, 594 P.2d 69, 70 (Alaska 1979). This court's decision in *Riley v. State*, 720 P.2d 951 (Alaska App.1986), strongly suggests that a defendant who commits first-degree murder is often, by virtue of the crime alone, properly categorized as a "worst offender". In *Riley*, this court rejected a proposed 60-year benchmark sentence for first-degree murder—primarily because 99-year sentences for first-degree murder have consistently been upheld by the Alaska appellate courts. *Id.*, 720 P.2d at 952.

■ *Riley* does not establish the rule that first-degree murderers can always receive 99-year sentences, nor does *Riley* free sentencing judges from the obligation to base sentences on a careful consideration of the *Chaney* sentencing criteria. *See Riley*, 720 P.2d at 952; *State v. Chaney*, 477 P.2d 441, 443–44 (Alaska 1970); AS 12.55.005. However, after *Riley*, a defendant who challenges a 99-year sentence for first-degree murder must show some reason to believe that his offense is mitigated or that his background is atypically favorable.

■ Judge Jeffery found that Sakeagak's case presented three of the aggravating factors listed in AS 12.55.155(c): (c)(5) (that Sakeagak knew or reasonably should have known that his victim was particularly vulnerable), (c)(8) (that Sakeagak had a history of assaultive conduct), and (c)(18)(A) (that Sakeagak's crime was committed against a person living in the same household). The judge also noted that Sakeagak's murder of his wife had been the culmination of a "continuum of domestic violence". Sakeagak had a lengthy history of assaults upon his wife. Most of these assaults were not prosecuted, but one incident (in which Sakeagak slammed his wife's head against a door and then cut her arm with a hunting knife) led to Sakeagak's conviction in 1992 for fourth-degree assault.[1]

Judge Jeffery concluded that, in fashioning Sakeagak's sentence, he needed to stress the community's condemnation of domestic vio-

lence. The judge concluded that Sakeagak had little insight into his criminal behavior and that there was a substantial danger that Sakeagak would resort to similar violence in any future relationship. Judge Jeffery also noted that Sakeagak had a serious and long-standing alcohol problem, a problem that Sakeagak had failed to address despite several past opportunities.

Sakeagak does not seriously dispute any of this. He does argue, however, that despite these aggravating circumstances there is "nothing in the record" to indicate that he intended to kill his wife when he assaulted her. The jury found otherwise; they convicted Sakeagak of first-degree murder, which requires a finding that Sakeagak intended to kill his wife. The record contains ample evidence to support this finding.

Sakeagak argues that his crime is less aggravated than some of the other first-degree murders that have been reviewed on appeal. This is true. However, as explained above, a 99-year sentence for first-degree murder will generally be upheld unless a defendant shows that their offense is mitigated or that their background is unusually favorable. Sakeagak has shown neither. Judge Jeffery found that Sakeagak's murder of his wife was aggravated in two aspects: first, because it was an instance of domestic violence; and second, because Sakeagak knew that his wife was particularly vulnerable due to her intoxication. In addition, Sakeagak's long-standing problem with alcohol and his prior assaults on his wife both support a finding that Sakeagak's background is unfavorable. For these reasons, we conclude that Sakeagak's 99-year sentence is not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

1. Sakeagak also had a lengthy history of misdemeanor convictions. These convictions included: driving while intoxicated in 1985; third-degree theft and third-degree criminal mischief in 1988; another driving while intoxicated in 1990; a third driving while intoxicated in 1992; and a second third-degree theft and a fourth driving while intoxicated in 1994.