William L. WURTHMANN, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7320.

Court of Appeals of Alaska.

June 1, 2001.

Douglas O. Moody, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

John A. Scukanec, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

A jury convicted William L. Wurthmann on nine counts of sexual abuse of a minor—five counts of first-degree,[1] two counts of second-degree,[2] and two counts of third-degree[3]—for sexually abusing his live-in girlfriend's daughter. Wurthmann appeals his conviction, arguing that the superior court erred in denying his motion for judgment of acquittal on the two counts of third-degree sexual abuse of a minor. Wurthmann also argues that the superior court committed reversible error by not instructing the jury that it must reach unanimity on specific incidents of sexual abuse. Finally, Wurthmann argues that the court abused its discretion by failing to redact a police detective's opinions on Wurthmann's credibility contained in a videotaped interview that was played to the jury. We conclude that Wurthmann's claims are without merit and affirm the decision of the superior court.

1. AS 11.41.434(a)(1), (a)(3)(A).

2. AS 11.41.436(a)(2).

*Facts and proceedings*

Wurthmann moved in with M.L., A.L.'s mother, in 1987, when A.L. was ten years old. Although Wurthmann never formally married M.L., he assumed the role of A.L.'s stepfather. Wurthmann was generally unemployed and was A.L.'s primary caretaker. In addition to spending time with A.L., and taking her shopping and to the movies, Wurthmann was the disciplinarian.

A.L. testified that Wurthmann began giving her backrubs when she was ten or eleven years old. He then began touching her breasts. When she was twelve years old, Wurthmann penetrated A.L.'s vagina with his finger. This sexual touching progressed to an "everyday routine" of fellatio, cunnilingus and sexual intercourse that began when A.L. was twelve years old and continued until she left for college. A.L. was able to describe numerous specific incidents of sexual abuse by Wurthmann, including instances in which he rubbed and digitally penetrated her vagina while she lay in bed; performed cunnilingus in the living room; and engaged in sexual intercourse in front of the fireplace, outdoors in the shed, in Wurthmann's and M.L.'s bed, in A.L.'s bed, and in a car in a parking lot.

Wurthmann admitted in an interview with police that he had a consensual sexual relationship with A.L. after she turned seventeen, but denied the allegations of earlier abuse. At trial, Wurthmann did not testify or present evidence. His strategy was to attack A.L.'s credibility regarding the earlier incidents of sexual abuse by impeaching her with her prior inconsistent statements to the police. He argued that A.L. made up the childhood sexual abuse so she would not have to admit to her mother that she had stolen her mother's boyfriend.

Wurthmann also moved for judgment of acquittal on two counts of third-degree sexual abuse of a minor, arguing that he could not be convicted for having sex with A.L. when she was sixteen and seventeen years old because he did not occupy a "position of authority" over her.[4] Superior Court Judge

3. AS 11.41.438(a)(2).

4. *See* AS 11.41.438(a)(2).

Eric T. Sanders concluded that whether Wurthmann was in a position of authority over A.L. for purposes of third-degree sexual abuse was a question of fact, and permitted Wurthmann to argue to the jury that he did not occupy that position with respect to A.L.

The jury convicted Wurthmann on all nine counts. Judge Sanders sentenced Wurthmann to a composite sentence of 15 years with 3 years suspended.

*Did the superior court err in denying Wurthmann's motion for judgment of acquittal on the two counts of third-degree sexual abuse?*

Wurthmann argues that the superior court erred by not granting his motion for judgment of acquittal on counts eight and nine, which charged him with third-degree sexual abuse for having sexual intercourse with A.L. in the car on the way back from a rafting trip when she was sixteen years old, and at home when she was seventeen.

Under AS 11.41.438(a)(2), a person is guilty of third-degree sexual abuse of a minor if "being 18 years of age or older, the offender engages in sexual penetration with a person who is 16 or 17 years of age and at least three years younger than the offender, and the offender occupies a position of authority in relation to the victim." Wurthmann argues that this court should reverse his conviction on these counts because he did not occupy a "position of authority" over A.L. Wurthmann concedes that he lived with A.L. and exercised authority over her as a father figure. But he argues that the legislature intended "position of authority" for purposes of the third-degree sexual abuse statute to

"mean something more than merely acting like a father."[5]

The prohibition against sexual contact with sixteen- and seventeen-year-olds by persons in "positions of authority" was added to the sexual abuse statutes in 1990. These changes were precipitated by the Satch Carlson case.[6] Carlson, an Anchorage high school teacher, had been charged with two counts of sexual abuse of a minor in the first degree[7] and one count of sexual abuse of a minor in the second degree[8] after he had sex with a seventeen-year-old student.[9] The statutes in effect at that time prohibited adults from having sex with sixteen- and seventeen-year-old minors entrusted to their care "by authority of law."[10] Superior Court Judge Karl S. Johnstone determined that this language prohibited sex with children in this age bracket by legal guardians, but not by teachers.[11]

In response to the *Carlson* decision, the legislature amended the sexual abuse statutes to prohibit sexual contact with sixteen- and seventeen-year-olds by adults in "positions of authority."[12] The legislature intended this prohibition to encompass not just teachers, but "substantially similar" adults "in positions that enable them to exercise undue influence over children."[13] Alaska Statute 11.41.470 was amended in 1990 to provide a non-exclusive list of the individuals who occupy positions of authority under this definition:

> (5) "position of authority" means an employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, or a substantially similar position, and a police officer or proba-

---

5. We apply our independent judgment in interpreting statutes. *See Conner v. State*, 696 P.2d 680, 682 (Alaska App.1985).

6. *See* Committee Minutes, House Health, Education and Social Services Standing Committee hearing on S.B. 355 (March 9, 1990).

7. Former AS 11.41.434(a)(2)(A).

8. Former AS 11.41.436(a)(3)(A).

9. *See State v. Carlson*, No. 3AN–S89–7443 CR (Alaska Super., January 18, 1990).

10. Former AS 11.41.434(a)(2)(A); former AS 11.41.436(a)(3)(A).

11. *See Carlson*, No. 3AN–S89–7443 CR at 4.

12. *See* AS 11.41.438(a)(2); ch. 151, § 3, SLA 1990.

13. Letter of Intent for S.B. 355, 1990 House Journal 4199; 1990 Senate Journal 4220.

tion officer other than when the officer is exercising custodial control over a minor[.] [14]

Contemporaneously with these amendments to the third-degree sexual abuse statute, the phrase "position of authority" was *deleted* from AS 11.41.434(a)(3)(A), the subsection of the first-degree sexual abuse statute that prohibited an adult who had no legal or biological relationship with a child under sixteen years of age from having sex with that child when the victim is "residing as a member of the social unit in the same household as the offender and the offender is in a *position of authority* over the victim." [15] The subsection was amended to read: "the victim at the time of the offense is residing in the same household as the offender and the offender *has authority* over the victim." [16] Subsection (a)(3)(B) was amended at the same time to prohibit sex with a child under sixteen by an adult who "occupies a *position of authority* in relation to the victim," regardless of whether that adult is living in the same household as the child.[17]

Because of this distinction, Wurthmann contends that "position of authority" for purposes of the sexual abuse statutes must mean something more than "merely acting like a father" or the "has authority" language in AS 11.41.434(a)(3)(A) would be completely subsumed within subsection (a)(3)(B) and would be surplusage.

We agree with Wurthmann that this change in the wording in the first-degree sexual abuse statute has only one reasonable explanation: the legislature intended to distinguish between an individual who lives in

the same household and "has authority" over a child and one who occupies a "position of authority" over a child as defined in AS 11.41.470(5). But we disagree that a person who "has authority" over a child under AS 11.41.434(a)(3)(A) can in no circumstances also occupy a "position of authority" over that child. Wurthmann offers no evidence from the legislative history of the 1990 amendments to the sexual abuse statutes to indicate that the legislature intended this result.

[1] A more persuasive explanation is that the legislature reworded AS 11.41.434(a)(3)(A) to delete "position of authority" because it did not want to require proof of this additional element, as newly defined in AS 11.41.470(5), to find that a household member had committed first-degree sexual assault. A roommate, adult stepsibling, or live-in boyfriend might, depending on the dynamics of the household, the personalities of the individuals involved, and the amount of authority the legal or biological parent delegates, have only limited and intermittent authority over a child in the household. But a live-in boyfriend who assumes the position of a stepfather has additional influence by virtue of his status as a person of special trust in the child's life.[18] Although the first-degree sexual abuse statute prohibits sexual abuse of children under sixteen by both categories of offenders, the third-degree statute, which punishes sexual conduct with older children, reaches only offenders who by virtue of their position in relation to the child—irrespective of the level of authority they actually exercise—have undue influence over a child.[19] Judge Sanders correctly con-

---

14. Ch. 151, § 5, SLA 1990.

15. Emphasis added. The following changes were made to AS 11.41.434(a)(3)(A)-(B):
    (a) An offender commits the crime of sexual abuse of a minor in the first degree if
    . . . .
    (3) being 18 years or older, the offender engages in sexual penetration with a person who is under 16 years of age, and
    *(A)* the victim at the time of the offense is [ (A)] residing [AS A MEMBER OF THE SOCIAL UNIT] in the same household as the offender and the offender *has* [IS IN A POSITION OF] authority over the victim; or
    (B) *the offender occupies a position of authority in relation to the victim* [TEMPORARILY ENTRUSTED TO THE OFFENDER'S CARE].

*See* ch. 151, § 1, SLA 1990.

16. AS 11.41.434(a)(3)(A); *see supra* (emphasis added) note 14.

17. Emphasis added. *See supra* note 14.

18. *Cf. Carter v. Brodrick*, 644 P.2d 850, 855 (Alaska 1982) (holding that a stepchild is a "child of the marriage" for purposes of granting visitation to a stepparent if the stepparent has assumed the status of *in loco parentis*).

19. *See* AS 11.41.470(5); Letter of Intent for S.B. 355, 1990 House Journal 4199; 1990 Senate Journal 4220.

cluded that this is a fact-bound inquiry appropriately left to the jury.[20]

[2] Generally, criminal statutes are strictly construed in favor of the defendant.[21] But "[s]trict construction does not require that statutes be given the narrowest meaning allowed by the language; rather, the language should be given 'a reasonable or common sense construction, consonant with the objectives of the legislature.'"[22] The 1990 revisions were expressly intended to extend the reach of the sex abuse statutes to persons "in positions that enable them to exercise undue influence over children."[23] As the State points out, it would be unreasonable to attribute to the legislature an intent to impose criminal liability on a babysitter or teacher but not a live-in boyfriend who assumes the role of a stepfather and is even better positioned to manipulate a child in his care.[24]

[3] Wurthmann's argument that live-in boyfriends necessarily fall outside the reach of AS 11.41.438(2) is not supported by the language and history of the sexual abuse statutes and is contrary to the legislature's intent to criminalize sexual conduct with sixteen- and seventeen-year-old minors by adults in positions of authority. Because Wurthmann assumed authority over A.L. not just as her mother's live-in boyfriend, but as A.L.'s stepfather and primary caretaker, a reasonable jury could conclude that he exercised undue influence over A.L. and was in a "position of authority" over her for purposes of AS 11.41.438(a)(2).[25] We thus reject Wurthmann's claim that the superior court erred in denying his motion for judgment of acquittal.

*Does the superior court's erroneous* Covington *instruction require reversal?*

During the discussion of jury instructions, the parties and the court discussed the need for an instruction under *Covington v. State*[26] that the jury must agree unanimously that the defendant committed the specific incident of sexual abuse charged in each count of the indictment. The parties and the court agreed on an instruction to meet this requirement. However, the instruction that the court actually gave was not the agreed instruction. Instead, Judge Sanders instructed the jury that it only needed to unanimously agree that the particular type of sexual conduct alleged in each count—for example, digital penetration—had occurred in the relevant period. That instruction permitted the jury to convict the defendant without agreement on a specific incident of abuse for each count.

[4, 5] The parties agree that this instruction did not meet the *Covington* requirements that the jury must unanimously agree that a specific incident of sexual abuse alleged in a count of the indictment occurred within the time period covered by the count. However, Wurthmann failed to object when this instruction was read to the jury.[27] But because an erroneous *Covington* instruction implicates a defendant's constitutional right to a unanimous verdict, we review his claim

---

20. *See State v. Beason*, 2 P.3d 459, 463 (Utah App.2000) (quoting Utah Code Ann. § 76–5–404.1(3)(h) (1995) ("Whether a person not specifically listed in the statute was in a position of special trust, defined as a 'position of authority, who, by reason of that position is able to exercise undue influence over the victim,' ... presents a question of fact to be determined by the trier of fact in each case.")).

21. *See Conner*, 696 P.2d at 682.

22. *Id.* at 682 (quoting *Belarde v. Anchorage*, 634 P.2d 567, 568 (Alaska App.1981)); *see also Hillman v. Anchorage*, 941 P.2d 211, 215 (Alaska App.1997) (courts should avoid construing statutes to defeat the obvious legislative purpose).

23. Letter of Intent for S.B. 355, 1990 House Journal 4199; 1990 Senate Journal 4220; Committee Minutes, Senate Judiciary Committee Hearing on S.B. 355 (January 23, 1990).

24. *See Peters v. State*, 943 P.2d 418, 420 (Alaska App.1997) (statutes dealing with the same or related subject matter should be construed as harmoniously as possible).

25. *See Willett v. State*, 836 P.2d 955, 957 (Alaska App.1992).

26. 703 P.2d 436 (Alaska App.1985) (*Covington I*), modified on reh'g, 711 P.2d 1183 (Alaska App. 1985) (*Covington II*).

27. *See* Alaska R.Crim.P. 30.

for plain error.[28] An error affecting constitutional rights is harmless under a plain error analysis if it did not appreciably affect the verdict.[29]

In *Covington I*, and on rehearing in *Covington II*, we concluded that Covington was denied his right to a unanimous verdict because the State did not elect a specific incident of sexual abuse within each count to support Covington's conviction and because no clarifying instruction was given requiring the jury to unanimously agree on specific incidents of sexual abuse.[30] We described the circumstances under which such an error would be prejudicial and require reversal:

> In a case where discrete incidents of sexual abuse are charged together in a single count, and impeaching and contrary evidence of differing weight is offered to rebut the several incidents, a real possibility exists that individual jurors will reject some incidents, based upon an evaluation of the impeaching and contrary evidence, but accept other incidents as proven. In such a case, the twelve jurors may agree that the defendant committed at least one of the incidents, but be in general disagreement as to which incident that was.[31]

We concluded that these circumstances were not present in *Covington*. The complaining witness had shared a bed with her father for years and had engaged in sexual intercourse almost every night.[32] She thus was not able to differentiate between various incidents of sexual abuse.[33] Covington denied that he had ever had sex with his daughter. Under these circumstances, "no impeaching or contrary evidence was more applicable to one incident than another" and the jury was faced with a straight question of credibility.[34] The jury's verdict convicting Covington on all counts established that it

had accepted the daughter's testimony and rejected Covington's contrary claims.[35]

Wurthmann argues that the superior court's erroneous *Covington* instruction was not harmless in his case because he impeached A.L. about specific incidents of sexual abuse. Because the only specific incidents Wurthmann impeached were A.L.'s allegations that he had digitally penetrated her at age twelve and engaged in sexual intercourse with her at age thirteen, he is in effect arguing that the jury may have convicted him on counts I and III, two counts of first-degree sexual assault, without reaching unanimity on an underlying incident of abuse.

This argument fails as to count I because A.L. described only one specific incident of digital penetration that occurred when she was twelve, the age covered by this count. Wurthmann attempted to impeach A.L. with her prior statement to police that the first incident of digital penetration occurred when she was thirteen. The jury, by convicting Wurthmann on this count, must have rejected his impeaching evidence and unanimously agreed that the incident A.L. related at trial had been proved beyond a reasonable doubt.

Wurthmann's argument also fails as to count III because Wurthmann challenged only one of two separate incidents of sexual intercourse alleged during the time period covered by this count. Even assuming that the jury rejected A.L.'s trial testimony regarding the first incident of sexual intercourse in front of the fireplace because it was inconsistent with her initial statement to police, it is unlikely that the jury would have rejected A.L.'s uncontradicted testimony regarding a second incident that occurred in the shed. The fact that the jury convicted Wurthmann on all counts indicates that it accepted A.L.'s testimony that Wurthmann

---

28. *See Covington II*, 711 P.2d at 1184 (citing Alaska R.Crim. P. 47(b)). Alaska R.Crim.P. 47(b) provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

29. *See Covington II*, 711 P.2d at 1185 (citing *Van Hatten v. State*, 666 P.2d 1047, 1056–57 (Alaska App.1983)).

30. *See id.* at 1184 (citing *Covington I*, 703 P.2d at 441).

31. *Id.* at 1185.

32. *See id.*

33. *See id.*

34. *Id.*

35. *See id.*

began abusing her when she was twelve years old and rejected Wurthmann's claim that A.L. had fabricated the abuse. Given the jury's credibility determination, there is little doubt that the jury would have reached unanimity on the second incident of sexual abuse that Wurthmann failed to impeach or contradict.

[6] We conclude that the trial court's error in failing to instruct the jury on the need for unanimity as to specific incidents of sexual abuse was harmless. Given the evidence and the jury's credibility determination, it cannot be fairly said that the jury would have failed to reach unanimity on the conduct alleged if it had been properly instructed.[36]

*Did the superior court abuse its discretion by not redacting the detective's opinions from an interview played to the jury?*

[7] Wurthmann next argues that Judge Sanders erred in declining to redact statements Detective Randy Carroll made in a pre-arrest interview of Wurthmann that indicated that he believed A.L.'s allegations of sexual abuse and disbelieved Wurthmann's denials. The videotape of this interview was played to the jury.

In his interview of Wurthmann, Detective Carroll said he believed that A.L.'s allegation that the sexual abuse had spanned years was closer to the truth than Wurthmann's claim that a sexual relationship did not begin until A.L. was seventeen years old. Wurthmann argued at trial that admitting Carroll's assertions regarding Wurthmann's credibility would be reversible error. Judge Sanders disagreed and declined to redact these statements of opinion. However, Judge Sanders noted that he would provide the jury a limiting instruction that Carroll's comments were not admitted for the truth but to give context to Wurthmann's answers.

Detective Carroll stated in this interview that he believed Wurthmann had sexual contact with A.L. when she was under seventeen because of admissions Wurthmann had made in his letters to A.L. Because these letters were admitted into evidence, the jury had the opportunity to independently evaluate the basis for Carroll's suspicions. Moreover, Carroll's comments were so integral to the interview that their removal would have deprived the jury of the context for Wurthmann's statements.[37] Furthermore, Carroll testified that his statements were part of an interview strategy designed to encourage Wurthmann to admit his criminal conduct. Thus, there was little risk of prejudice from Carroll's comments.[38] We conclude that Judge Sanders did not abuse his discretion by declining to redact Carroll's statements.[39]

*Conclusion*

The judgment of the superior court is AFFIRMED.

MANNHEIMER, Judge, dissenting.

I agree with my colleagues that most of Wurthmann's convictions should be affirmed. However, I conclude that Wurthmann's two convictions for third-degree sexual abuse of a minor must be reversed. Although Wurthmann engaged in sexual penetration with A.L., he did not occupy a "position of authority" in relation to her, and thus his conduct does not fall within the legislature's definition of the crime.

*The legal problem presented here*

Wurthmann engaged in sexual penetration with A.L. when she was between the ages of 16 and 18. Under Alaska law, the normal age of consent for sexual activity is 16. That is, A.L. could validly consent to sexual activity with most adults. But the legislature has raised the age of consent in various situations

---

36. *See Covington II*, 711 P.2d at 1185; *Love v. State*, 457 P.2d 622, 630–32 (Alaska 1969).

37. *See Linne v. State*, 674 P.2d 1345, 1356 n. 8 (Alaska App.1983) (court did not err in failing to exclude hearsay portions of videotaped interview with defendant because the jury could not have understood defendant's responses without hearing the questions that elicited them).

38. *See Sakeagak v. State*, 952 P.2d 278, 282–83 (Alaska App.1998).

39. *See Hawley v. State*, 614 P.2d 1349, 1361 (Alaska 1980) (trial court's evidentiary rulings reviewed for abuse of discretion).

in which the adult has a special relationship with the teenager.

One of these exceptions is for adults who occupy a "position of authority" with respect to the teenager. The term "position of authority" is defined in AS 11.41.470(5). This statute declares that "position of authority" refers to adults who are the teenager's

> employer, youth leader, scout leader, coach, teacher, counselor, school administrator, religious leader, doctor, nurse, psychologist, guardian ad litem, babysitter, or [who occupy a] substantially similar position[.]

All of these adults, because of their professional or quasi-professional roles, are deemed to have greater influence over teenagers, thus justifying the legislature in enacting special provisions to govern their sexual relations with teenagers.

But Wurthmann did not occupy any of these professional or quasi-professional roles with respect to A.L. Rather, he was the live-in boyfriend of A.L.'s mother. True, Wurthmann's relationship with A.L.'s mother lasted for many years, and he came to occupy the role of A.L.'s de facto stepfather. But Wurthmann does not easily fit into any of the categories of adults mentioned in the statutory definition of "position of authority". Instead, Wurthmann seems to be squarely covered by another special category of adults defined in the sexual abuse statutes: adults who "resid[e] in the same household as the [teenager] and ... ha[ve] authority over the [teenager]".[1]

If Wurthmann had been charged with first- or second-degree sexual abuse of a minor, it would make no difference whether he was a "same household" adult or a "position of authority" adult. The statutes defining first-degree and second-degree sexual abuse of a minor treat these two groups of adults exactly the same. Both groups are treated more harshly than other adults if they engage in sexual penetration with a teenager who is 13, 14, or 15 years old. (They are guilty of first-degree sexual abuse rather than second-degree sexual abuse.)[2] Likewise, both groups are treated more harshly than other adults if they engage in sexual contact with a teenager who is 13, 14, or 15 years old. (They are guilty of second-degree sexual abuse rather than third-degree sexual abuse.)[3]

But Wurthmann was charged with third-degree sexual abuse, and here the legislature did not treat the two groups the same. Under AS 11.41.438(a)(2), "position of authority" adults are guilty of third-degree sexual abuse if they engage in sexual penetration with a 16- or 17-year-old. However, this statute does not contain a parallel provision governing "same household" adults. Therefore, if the State was to convict Wurthmann of third-degree sexual abuse, it was not enough for the State to prove that he lived in the same household as A.L. and exercised authority over her. Rather, the State had to prove that Wurthmann held a "position of authority" over A.L. as that term is defined in AS 11.41.470(5).

*Why I conclude that Wurthmann did not occupy a "position of authority" with respect to A.L.*

The statutory provisions dealing with "same household" adults were enacted in 1988, while the "position of authority" provisions were not enacted until two years later, in 1990. Obviously, the legislature thought that they needed to create a new category, "position of authority", to deal with situations that were not already covered by the "same household" provisions. But more important, for purposes of deciding Wurthmann's case, is the fact that the legislature did not delete the "same household" provisions when they enacted the "position of authority" provisions. This means that the legislature did not think that the new category (adults in positions of authority) encompassed the old

---

1. *See* AS 11.41.434(a)(3)(A) (first-degree sexual abuse of a minor) and AS 11.41.436(a)(5)(A) (second-degree sexual abuse of a minor).

2. *Compare* AS 11.41.434(a)(3) *with* AS 11.41.436(a)(1).

3. *Compare* AS 11.41.436(a)(5) *with* AS 11.41.438(a)(1).

category (adults residing in the same household who exercise authority over the child).

This conclusion—that the legislature did not think these two groups were the same—is emphasized most vividly by the wording of AS 11.41.438, the third-degree sexual abuse of a minor statute. This statute raises the age of consent to 18 in particular circumstances. When the legislature amended AS 11.41.438 in 1990 to make it a crime for certain adults to engage in sexual penetration with 16- and 17–year–olds, the legislature omitted "same household" adults and included only "position of authority" adults. Thus, the legislature obviously thought that there was a substantive difference between these two groups, and the legislature intended for these two groups to be treated differently with regard to their sexual relations with 16- and 17–year–olds. "Position of authority" adults commit a crime when they engage in such conduct; "same household" adults do not.

*(a) To uphold Wurthmann's conviction for third-degree sexual abuse, the majority has been forced to re-write the definition of "position of authority"*

Wurthmann is clearly a "same household" adult. For years, he lived in the same household as A.L., and he had substantial authority over her; in essence, he was A.L.'s stepfather. But to be convicted of third-degree sexual abuse, Wurthmann had to be a "position of authority" adult.

So how does Wurthmann, a "same household" adult, become transformed into a "position of authority" adult? The majority's answer is that "same household" adults can gradually become "position of authority" adults, depending on how long they live in the household with the teenager and how much authority over the teenager they are given by the teenager's legal parent (or, alternatively, how much authority they arrogate for themselves, even without the parent's consent).

According to the majority, a live-in boyfriend's ascension to the status of "position of authority" hinges on "the dynamics of the household, the personalities of the individuals involved, and the amount of authority the

legal or biological parent delegates". (Opinion, page 765) The majority declares that

[a] roommate, adult step-sibling, or live-in boyfriend might ... have only limited and intermittent authority over a child in the household. But a live-in boyfriend who assumes the position of a stepfather has additional influence by virtue of his status as a person of special trust in the child's life. [A live-in boyfriend can be deemed to occupy a "position of authority" if,] by virtue of [his] position in relation to the child ... [, he has] undue influence over a child.... [T]his is a fact-bound inquiry appropriately left to the jury.

Opinion, pages 765–766.

Some might agree that it is good policy to forbid sexual relations between teenagers and any adult who, because of "the dynamics of the [relationship and] the personalities of the individuals involved", comes to exercise "undue influence" over the teenager. But that is not the law the legislature wrote. AS 11.41.470(5) does not define "position of authority" in terms of the psychological strengths and weaknesses of the parties, or the dynamics of their relationship. Rather, the statute contains a list of professional and quasi-professional roles that might give an adult undue influence over a teenager. "De facto stepparent" is not among this list.

Conversely, if an adult does perform one of the roles listed in AS 11.41.470(5), the statute does not require proof that this adult *actually* exercised undue influence over the teenager—"undue influence" as determined by "the dynamics of [their relationship]" and "the personalities of the individuals involved". Rather, the adult's professional or quasi-professional role, by itself, conclusively establishes that the adult occupies a "position of authority".

*(b) Not only has the majority re-written the definition of "position of authority", but they have done it badly*

Not only has the majority effectively re-written the definition of "position of authority", but they have drafted a legal standard so vague that it practically invites unequal application. According to the majority, the

question of whether an adult occupies a "position of authority" must be answered by determining whether that adult is in a position to exercise "undue influence" over the teenager by virtue of the adult's status "as a person of special trust in the child's life." This status, the majority declares, is to be determined by assessing the "dynamics" of the relationship between the adult and the teenager, as well as "the personalities of the individuals involved".

There is nothing in the majority's definition that requires the adult to be living in the same household as the teenager, nor is there anything in this definition that requires proof that the adult fills one of the professional or quasi-professional roles listed in AS 11.41.470(5), or any other role substantially similar to those listed. The test has become "undue influence", pure and simple. Or rather, not so simple.

The majority asserts that "undue influence" is a "fact-bound issue" that juries should decide. But what standard is a jury to use? The majority says that the idea is to identify adults who occupy a position of "special trust", given the "personalities" of the adult and the teenager and the "dynamics" of their relationship. But these generalities do not provide much guidance to a jury seeking to decide whether a particular defendant occupied a position of authority with respect to a particular teenager. Nor do these generalities provide much guidance for trial judges who will inevitably have to draft jury instructions and answer jury questions about what this test means.

I fear that such a hazy and subjective legal test will only encourage juries to convict a defendant when they perceive him as predatory and, conversely, acquit a defendant when they perceive the teenager as sexually aggressive. This is not good law and, more important, it is not what the legislature had in mind.

*(c) In addition, the majority's interpretation of "position of authority" makes the legislature's "same household" provisions redundant*

The majority concludes that the term "position of authority" applies to any adult who exercises authority comparable to the authority enjoyed by the groups of adults listed in AS 11.41.470(5). But this is a misreading of AS 11.41.470(5). This statute does not say that an adult will be deemed to occupy a "position of authority" if the adult exercises *authority* that is substantially similar to the types of authority exercised by the listed groups. Rather, the statute says that an adult will be deemed to occupy a "position of authority" if the adult occupies a *position* that is substantially similar to the professional and quasi-professional positions listed in the statute. When the statute refers to adults who occupy a "substantially similar position", the statute is speaking of adults who occupy similar professional or quasi-professional roles—and not, as the majority apparently concludes, all adults who might exercise equal or greater authority over a child.

The problem with the majority's interpretation of the statute becomes clearer if one examines the groups of adults who are listed in AS 11.41.470(5) as occupying "positions of authority". The statute lists employers, youth leaders, scout leaders, coaches, teachers, counselors, school administrators, religious leaders, doctors, nurses, psychologists, guardians *ad litem*, and babysitters. Generally speaking, these adults have only limited contact with, and only intermittent authority over, the children that they deal with in their professional or quasi-professional roles.

Except in the case of "babysitters" (a term that could conceivably encompass people who provide all-day child care, five days a week), it appears that any adult in the legislature's "same household" category—that is, any adult who resides in the same household as the child and who has been granted authority over the child—will generally have an equal or better opportunity to pressure or manipulate a child into sexual activity than the groups of adults listed in the "position of authority" statute. For instance, it is difficult to imagine what kind of authority a household member might exercise over a child that would be less than the degree of authority exercised by a doctor or nurse who might see the child twice a year for half an hour, or by a babysitter who is hired to

spend an evening with the child once every month or two.

If, as the majority appears to hold, an adult must be deemed to occupy a "position of authority" as long as the adult exercises the same minimal amount of control over a child that characterizes such professionals and quasi-professionals, then essentially every adult who lives in the same household as a child and who exercises authority over the child will occupy a "position of authority" in relation to that child—for any such adult will certainly have at least the same limited degree of contact with the child, and the same circumscribed supervisory authority over the child, that characterizes the people listed in AS 11.41.470(5).

For this reason, the majority's interpretation of the "position of authority" statute violates one of the primary rules of statutory construction: that a court should assume that the legislature did not enact redundant or useless statutes. If two or more related statutory provisions arguably apply to a particular set of circumstances, a court should assume that the legislature intended these statutory provisions to mean different things. "One of the prime directives of statutory construction is to avoid interpretations that render parts of a statute 'inoperative or superfluous, void or insignificant'." [4] Courts must presume that, if the legislature saw fit to enact two or more separate statutory provisions dealing with the same problem or issue, the legislature must have believed that each provision was necessary—and, thus, that each provision applied to a different aspect of the problem or issue.

Under the majority's expansive interpretation of "position of authority", there would be no need for the legislature to enact separate provisions to prohibit sexual activity between children and the adults who reside with them and exercise authority over them. Any such adults would occupy "positions of authority". This indicates that the majority's interpretation of the statute is incorrect.

*(d) The majority's interpretation of "position of authority" appears to be at odds with the legislative history of the sexual abuse statutes*

I acknowledge that there is a certain moral force behind the majority's decision to hold Wurthmann guilty of third-degree sexual abuse. Because of his long-term relationship with A.L.'s mother, Wurthmann assumed the role of A.L.'s de facto stepfather. Thus, Wurthmann's real authority over A.L. was more expansive and continuous than the types of authority exercised by the groups of adults listed in AS 11.41.470(5), the statute defining "position of authority". From this, the majority concludes that Wurthmann's role in A.L.'s life must have amounted to a "position of authority". "[I]t would be unreasonable," the majority asserts, to think that the legislature "inten[ded] to impose criminal liability on a babysitter or teacher but not a live-in boyfriend who assumes the role of a stepfather and is even better positioned to manipulate a child in his care." (Opinion at 766)

But the legislative history of the sexual abuse statutes does indeed offer good reason to think that the legislature knew what they were doing, and made a purposeful choice, when they raised the age of consent to 18 for adults in positions of authority but kept the age of consent at 16 for adults who live in the same household and exercise authority over a teenager.

The "same household" provisions—*i.e.*, the amendments to the first- and second-degree sexual abuse statutes that increased the penalties for adults who engage in sexual activity with teenagers if they live in the same household as the teenager and exercise authority over the child—were enacted in 1988. The declared purpose of these 1988 amendments was to treat live-in boyfriends more like stepfathers when they engaged in sexual activity with teenagers under their authority.

Prior to 1988, a stepfather who engaged in sexual relations with a 13–, 14–, or 15–year-old stepchild was guilty of an unclassified felony (first-degree sexual abuse), but a live-

4.  *Champion v. State,* 908 P.2d 454, 464 (Alaska App.1995) (quoting *22,757 Square Feet, more or*

*less v. State,* 799 P.2d 777, 779 (Alaska 1990)).

in boyfriend who engaged in similar sexual activity with his girlfriend's child was treated like any other adult; that is, he was guilty of only a class B felony (second-degree sexual abuse). The 1988 amendments increased the punishment for sexual activity between an adult and a child under the age of 16 years if the adult was "residing as a member of the social unit in the same household as the [victim]" and if the adult exercised authority over the child. In other words, the amended law applied to adults who functioned as de facto members of the teenager's family.

However, the legislature did not completely eliminate the disparity between stepfathers and live-in boyfriends. For stepparents, the legislature raised the age of consent to 18. That is, stepparents were guilty of sexual abuse (in either the first or second degree) if they engaged in sexual activity with stepchildren under the age of 18. But for live-in boyfriends—even live-in boyfriends who function exactly like stepfathers—the legislature expressly decided to leave the age of consent at 16.

In the letter of intent that accompanied the 1988 amendments, the House Judiciary Committee declared that 16 years of age, rather than 18, should be the cut-off point for a live-in boyfriend's criminal liability:

> The addition of AS 11.41.434(a)(3) ... recognizes that the most serious forms of child sexual abuse are often committed by those who live in the same household as the victim or who are temporarily entrusted with the victim's care.
>
> Despite having no legal authority over the victim, such persons are nonetheless in a position of power such that even older children often find it impossible to thwart their advances.... [T]he new changes apply only to victims from 13 to 15 years old. The cutoff at 16 years of age was specifically chosen instead of the 18–year–old cutoff in other subsections dealing with persons with legal or biological ties to the victim.

1988 House Journal 2331.

Thus, the legislature understood that the new law would create a discrepancy between the criminal liability of stepparents and the criminal liability of live-in boyfriends. The age of consent for stepparents would be 18, while the age of consent for live-in boyfriends would be 16. Assistant Attorney General Dean J. Guaneli told the House Judiciary Committee that this disparate treatment "was a judgment call" by the law's drafters. He explained, "[W]ith certain types of offenders, such as a parent or legal guardian, it may not be possible for someone sixteen or seventeen years of age to avoid the advances of [such an] adult, so it is appropriate to prohibit sexual [activity between them] up to age 18. [But with] a live-in boyfriend[,] ... it may not be the same." [5]

There is no similar letter of intent to explain the legislature's purpose when they amended the definition of third-degree sexual abuse in 1990. But the legislature's action can reasonably be construed as a purposeful continuation of the policy they adopted in 1988—the policy that the age of consent should remain at 16, even when an adult lives in the same household as the teenager and exercises authority over the child.

In the first- and second-degree sexual abuse statutes, "same household" adults and "position of authority" adults are treated exactly the same. (In fact, the "same household" and the "position of authority" provisions appear as linked pairs in both statutes.) With respect to both groups, the first- and second-degree sexual abuse statutes do not alter the normal age of consent; i.e., the age of consent remains at 16. But the statutes impose a more severe penalty on "same household" and "position of authority" adults for sexual activity that is already criminal for other adults—sexual activity with teenagers between the ages of 13 and 16.

The third-degree sexual abuse statute is different. It raises the age of consent to 18, thus punishing sexual activity that would not be criminal for other adults—sexual penetration with a 16– or 17–year–old. The legislature wrote this statute so that "position of authority" adults commit third-degree sexual abuse when they engage in such conduct, but "same household" adults do not.

**5.** Minutes of the House Judiciary Committee, January 26, 1988: hearing on House Bill 237.

My colleagues can not find any conceivable rationale for the legislature's action, at least when the "same household" adult exercises the same kind of authority (or greater authority) than the adults who pursue the professions and quasi-professions listed in AS 11.41.470(5). But one could reasonably argue that the wording of the third-degree sexual abuse statute simply re-confirms the legislature's 1988 policy decision not to raise the age of consent for "same household" adults.

The majority suggests that there is little to recommend this policy. Be that as it may, it is the legislature's role to set policy, and it is this court's role to interpret statutes as the legislature intended. The legislature consciously chose not to raise the age of consent for "same household" adults when they created that category of offender in 1988. Although the matter obviously can be debated, there is good reason to believe that the legislature was simply following that same policy when, in 1990, they wrote the third-degree sexual abuse statute to exclude "same household" adults.

Ambiguous criminal statutes must be interpreted against the government.[6] Thus, Wurthmann does not have to convincingly prove that this is exactly what the legislature was thinking when they wrote the third-degree sexual abuse statute to include "position of authority" adults while at the same time excluding "same household" adults. Rather, it is the State's (and the majority's) burden to show that Wurthmann's interpretation of the legislature's actions is untenable. I do not believe that this interpretation of the legislative history is untenable, and I therefore conclude that this court has a duty to interpret the statute in Wurthmann's favor.

### Conclusion

For the reasons explained here, I conclude that the majority has wrongly construed the definition of "position of authority" codified in AS 11.41.470(5). Although Wurthmann lived in the same household as A.L. and exercised substantial authority over her, Wurthmann did not occupy a "position of

authority" in relation to A.L.. I therefore conclude that Wurthmann could not legally be convicted of third-degree sexual abuse of a minor.

---

**6.** *See Wells v. State,* 706 P.2d 711, 713 (Alaska App.1985) ("It is well established that ... ambiguities in penal statutes must be resolved in favor of the accused.").