NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>*. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| ALBERT PETER MACASAET III, | Court of Appeals No. A-13574 |
| Appellant, | Trial Court No. 1PW-16-00136 CR |
| v. | |
| STATE OF ALASKA, | O P I N I O N |
| Appellee. | No. 2798 — February 14, 2025 |

Appeal from the Superior Court, First Judicial District, Prince of Wales, David V. George and M. Jude Pate, Judges.

Appearances: Kelly R. Taylor, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Seneca Theno Freitag, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge HARBISON.

Following a jury trial, Albert Peter Macasaet III was convicted of first-degree murder for killing Judylee Guthrie, his long-term girlfriend and the mother of his children.[1]

Macasaet appeals his conviction, raising three claims. First, Macasaet challenges the superior court's denial of his motion to suppress certain evidence obtained from a search of his cell phone. He contends that the warrant authorizing the search lacked probable cause to obtain Facebook Messenger messages and call logs on his cell phone, that the warrant was insufficiently particular, and that the relevant search was conducted outside of the time limit set by the court. For the reasons explained in this opinion, we conclude that the warrant lawfully authorized the search of Macasaet's phone for text messages and call logs that were made close in time to Guthrie's death, and that the police conducted the search before the information supporting the warrant had become stale.

Second, Macasaet argues that the court erred by denying his motion to suppress certain statements that he made without first receiving *Miranda* warnings. We agree that the police should have read Macasaet *Miranda* warnings before questioning him during the execution of a warrant to seize biological samples from his body and in the immediate aftermath. However, we have reviewed the record and conclude that the admission of the challenged statements at trial was harmless beyond a reasonable doubt.

Third, Macasaet argues that the superior court erred by denying his motion for a mistrial. During trial, a police officer violated a protective order by suggesting that Macasaet had not expressed "genuine emotion" when he discussed Guthrie's death. We agree that the challenged testimony was improper, but we conclude that the court did not abuse its discretion by not ordering a mistrial.

We therefore affirm Macasaet's conviction for first-degree murder.

---

[1] AS 11.41.100(a)(1)(A).

*Background facts*

Albert Peter Macasaet III and Judylee Guthrie lived together with their children on Prince of Wales Island. On the evening of July 30, 2016, Macasaet, Guthrie, and some friends were drinking at Macasaet's mother's house in Klawock. Macasaet and Wesley Allen Minch left to get more beer at the store in Craig, which is six miles from Klawock. But when they got to Craig, they decided that instead of buying beer and returning to Klawock, they would remain in Craig and drink at the Hill Bar.

Macasaet testified at trial that while he was at the Hill Bar, he briefly spoke with an acquaintance, Chelsi Sage. According to Macasaet, he "shoo[ed]" Sage away, but Sage testified that their interaction was flirtatious.[2]

Eventually, Guthrie and her sister, Violet Guthrie (Violet), drove to Craig and joined Minch and Macasaet at the bar. Multiple witnesses (including Macasaet) testified that Guthrie was upset. The bar closed just before 3:00 a.m., and by this time, all four members of the group were intoxicated. Macasaet later described his level of intoxication as "extremely drunk."

Macasaet and Guthrie left the Hill Bar together in their car. Guthrie and Macasaet were in the front seats, and two acquaintances from the bar were in the back seat.[3] Initially, the group drove approximately six miles from Craig to Klawock, where one passenger exited the car. Afterwards, Guthrie and Macasaet drove back to Craig to drop off the other passenger.

At trial, Macasaet testified that after they dropped off the second passenger, they drove straight to the Sunnahae hiking trailhead, which is located on the

---

[2]   Sage testified that Macasaet told her she "looked cute" and suggested that they should get "a room."

[3]   At trial, there was conflicting testimony about who drove the car. Macasaet and James Mills testified that Guthrie was driving. However, Violet testified that Macasaet was driving.

outskirts of Craig off the highway to Klawock. Macasaet testified that Guthrie was driving the car, and he acknowledged that she remained "upset" with him at this time. According to Macasaet, Guthrie stopped the car at the trailhead, said, "Fine, you drive," exited the car, and walked towards the bike path alongside the highway.[4] Macasaet yelled for Guthrie to return, but she kept walking. After Guthrie did not return, Macasaet drove from the Sunnahae trailhead back to his mother's house in Klawock.

The next morning, Macasaet called the police to report that Guthrie was missing. Macasaet initially told the police that he had not seen Guthrie since the previous night. Macasaet spoke with the police four more times later that morning and in the afternoon. In these subsequent conversations, Macasaet clarified that he last saw Guthrie early that morning at the Sunnahae trailhead.

That evening, at 5:28 p.m., Macasaet called the police and reported that he was actively looking for Guthrie in Craig. Then, at 5:55 p.m., Macasaet called the police back to report that he had just located Guthrie's body in Klawock, near a gravel pit, during what he described as a random search.

When first responders arrived at the gravel pit, Macasaet did not accompany them to find the body. Rather, Macasaet remained inside a patrol car in the parking area while at least six first responders walked up a logging road located above the gravel pit. Initially, all of these first responders walked past the location of Guthrie's body without noticing it. It was not until two officers backtracked towards the gravel pit and stopped to talk that one officer spotted the body in vegetation "so thick that you had to be standing in the right spot to really see in there."

---

[4] A bike path runs alongside the Craig-Klawock Highway between the town of Craig and Craig High School. The bike path ends at the high school; it does not continue all the way to Klawock. The Sunnahae trailhead is located along a part of the highway serviced by this bike path.

2798

Guthrie's death was ruled a homicide. According to the autopsy report, Guthrie was strangled using the drawstring of her hooded sweatshirt and died from asphyxia.

The police focused on Macasaet as their prime suspect. While no direct evidence identified Guthrie's killer, the State relied on the following circumstantial evidence of Macasaet's guilt at trial: (1) Macasaet was the last person to see Guthrie alive, and the two had been arguing; (2) Macasaet decided to search for Guthrie in Klawock, even though Macasaet told the police he had last seen Guthrie alive in Craig; (3) Macasaet quickly located Guthrie's body near the gravel pit, even though her body was well-hidden by brush; (4) Macasaet provided numerous inaccurate and inconsistent statements to the police that minimized his potential involvement; and (5) Macasaet had a documented history of strangling Guthrie.[5]

*Prior proceedings*

Approximately two weeks after Guthrie's death, Macasaet was charged with one count of first-degree murder.[6] Ahead of trial, Macasaet's attorney filed two motions to suppress evidence that are relevant to this appeal.

First, the defense attorney moved to suppress statements that Macasaet made to the police during an interview on August 2, 2016. Macasaet voluntarily drove

---

[5] At trial, the State introduced evidence that Macasaet had strangled Guthrie on two prior occasions. In December 2009, Macasaet strangled Guthrie with his hands, which left her with red marks on her neck and swollen lips. Macasaet ultimately pleaded guilty to third-degree assault pursuant to a plea agreement. In October 2014, Macasaet strangled Guthrie in the presence of others, but was not charged for this offense. However, Macasaet provided a recorded statement to the police admitting that he "went straight for [Guthrie's] throat" and "put her on the ground," and this statement was admitted at trial.

[6] AS 11.41.100(a)(1)(A). Initially, Macasaet was also indicted on two counts of kidnapping and charged by information with fourth-degree assault and resisting arrest. AS 11.41.300(a)(1)(B), AS 11.41.230(a)(3), and AS 11.56.700(a)(1), respectively. These charges were dismissed before trial.

to the police station for this interview, but partway into the interview, the police executed a search warrant to obtain biological samples from Macasaet's body and to seize electronic devices. Macasaet moved to suppress all statements that he made after the police executed this warrant, alleging that he was subjected to a custodial interrogation without receiving *Miranda* warnings. The superior court denied this motion.

Second, the defense attorney moved to suppress data obtained from Macasaet's cell phone. After seizing the cell phone, the police obtained two warrants to search and seize data from it. Macasaet argued that these search warrants were overbroad, violating his constitutional rights, and that data was obtained during a search of his phone that was conducted outside of the timeframe permitted by the warrants. The superior court denied this motion as well.

The matter proceeded to a multi-week jury trial. After opening statements, Macasaet moved to preclude Trooper Benjamin Mank from offering his opinion that Macasaet's demeanor after Guthrie's death was inconsistent with an expression of genuine emotion. The State did not oppose this request, and the court granted the protective order.

During the State's case, the prosecutor called Trooper Mank as a witness. On direct examination, the prosecutor asked Mank about a conversation he had with Macasaet shortly after Guthrie's body was discovered. Mank testified that the only moment he observed "any tears, or . . . genuine emotion" in Macasaet's eyes was when Macasaet "started asking about what [he should] tell his boys." This statement implied that Macasaet did not show "genuine emotion" when he discussed Guthrie's death itself. The parties subsequently agreed that this testimony violated the protective order.

Macasaet moved for a mistrial, arguing that the violation of the protective order had undermined his right to a fair trial. The superior court found that Mank's testimony was improper, but it denied the mistrial motion, opting instead to take other curative measures, including striking the majority of Mank's testimony.

During the State's case, it introduced data obtained from AT&T detailing which cell phone tower Macasaet's phone communicated with during the night of Guthrie's death: the Craig tower or the Klawock tower. From these records, the State inferred that at 3:51 a.m., Macasaet and Guthrie were in Craig dropping off the second passenger; between 3:51 a.m. and 4:26 a.m., Macasaet drove from Craig to Klawock; and between 4:26 a.m. and 5:19 a.m., Macasaet killed Guthrie in Klawock.[7]

The State also introduced the results of DNA testing conducted by Dr. Julia Webb, who worked at the state crime lab, and Kim Gorman, who worked at a private lab. Webb testified that male DNA was found on Guthrie's breasts, anus, and underneath her fingernails. Gorman testified that her lab compared the male DNA to Macasaet's DNA profile using the Y-STR method. Gorman also testified that, while Macasaet could have contributed to the DNA on Guthrie's breasts and anus, he did not contribute to the DNA under Guthrie's fingernails and that there were two to three other unidentified males who contributed to the DNA on Guthrie's breasts.

The State additionally introduced exhibits detailing Macasaet's cell phone communications in the hours before and after Guthrie's death. These communications included text messages and call logs transmitted using the phone's default text messaging application, as well as text messages and call logs transmitted using the Facebook Messenger application. The State also introduced an exhibit showing that, a few days before Guthrie's death, Macasaet and Chelsi Sage had exchanged text messages about meeting at the Black Bear Diner.

After the State rested, the defense presented its case and Macasaet took the stand in his own defense. In his testimony, Macasaet acknowledged that he had a

---

[7]    Aside from a small zone between Craig and Klawock, the service area for the Craig and Klawock towers did not overlap (meaning cell phones located in Craig and Klawock would ping their respective towers). The AT&T records showed the following: at 3:51 a.m., Macasaet's cell phone was in or near Craig, and at 4:26 a.m. and 5:23 a.m., his phone was in or near Klawock.

history of strangling Guthrie and that he made inaccurate statements to the police after her death.[8] However, Macasaet denied killing Guthrie, and his attorney published an emotional 911 call Macasaet had placed after locating Guthrie's body.

During closing argument, the prosecutor characterized Guthrie's murder as a personal act of rage that was consistent with Macasaet's history of strangling Guthrie. The prosecutor suggested that each of these strangulations followed a pattern; Macasaet got drunk, became upset with Guthrie, strangled her, and then was overcome with guilt. The prosecutor argued that similarly, after killing Guthrie, Macasaet's guilt prompted him to ensure that her body was recovered quickly. The prosecutor also suggested that Macasaet was romantically interested in Chelsi Sage, which provided another motivation for killing Guthrie.

In Macasaet's closing argument, the defense attorney argued that the State's case was entirely circumstantial and that it failed to meet the high burden of proof beyond a reasonable doubt. The attorney also contested the State's interpretation of the DNA evidence, arguing that it exonerated Macasaet. According to the defense attorney, if Macasaet had strangled Guthrie to death, *his* DNA would have been found under Guthrie's fingernails (rather than other unidentified male DNA). The defense attorney finished his closing argument by playing Macasaet's emotional 911 call, and arguing, "Nobody is that good of an actor. That's real. That's raw. He's not a psychopath killer. Albert Macasaet is innocent."

Following deliberations, the jury convicted Macasaet of first-degree murder. This appeal followed.

---

[8] Macasaet admitted to providing inaccurate statements about the following events: how he got from the Sunnahae trailhead to Klawock; what shoes he was wearing the night Guthrie disappeared; and whether Guthrie left the Hill Bar with him, or with Wesley Allen Minch and Violet.

*The superior court did not err in denying Macasaet's motion to suppress data obtained from his cell phone*

On appeal, Macasaet challenges the superior court's order denying his motion to suppress data obtained from his cell phone. Specifically, Macasaet contends that the State improperly seized evidence from his cell phone pursuant to warrants that lacked particularity, lacked a probable cause nexus to the crime, and had expired by the time the search took place.

In evaluating a search warrant, we view the evidence in the light most favorable to upholding the warrant.[9] Doubtful or marginal cases are resolved in favor of the warrant, and the evidence supporting the warrant must be considered in a reasonable and commonsense manner.[10] Before evaluating Macasaet's claim, we first review the information available to the district court when it granted the search warrants, and to the superior court when it ruled on Macasaet's motion to suppress.

On July 31, 2016, the Alaska State Troopers seized Macasaet's cell phone (an Android Blu) after they discovered Guthrie's body near the gravel pit. The phone was then transferred to the Alaska State Troopers' Technical Crimes Unit in Anchorage, where it was placed in a storage locker.

On August 4, 2016, Investigator Ramin Dunford applied for a warrant to search Macasaet's phone.[11] In this application, Dunford sought permission to search the device's SD or SIM card for

> call logs, text messages, photographs, geolocation data, voice recordings, app data, deleted call log entries or deleted text messages, search history, web pages accessed, email and to document the cell phones by photographs.

---

[9] *State v. Chapman*, 783 P.2d 771, 772 (Alaska App. 1989).

[10] *Id.*

[11] At the time of the investigation, Ramin Dunford was an investigator in the Special Criminal Investigations Unit, but before trial he was promoted to sergeant.

Dunford included an affidavit with the warrant application. In this affidavit, Dunford gave an overview of the "highly technical" process of conducting a forensic analysis of a cell phone. He explained that after data is extracted from the phone, it must be sorted to determine "which particular files are evidence or instrumentalities of crimes," a process that can take "weeks or months."

Dunford's affidavit also included a lengthy probable cause statement detailing why the police suspected Macasaet of killing Guthrie. In this statement, Dunford noted that Macasaet had used his cell phone to place calls and to send text messages on the day of Guthrie's death.

On August 4, 2016, the district court granted the warrant to search Macasaet's phone under the parameters that Dunford requested and ordered that the search be conducted within thirty days.

On August 5, 2016, Dunford asked Nathan Bucknall, an investigator with the Technical Crimes Unit, to execute the search warrant. Bucknall later testified that the phone was passcode protected when he received it. Consequently, the only way to extract data was to conduct a "physical search" using Cellebrite technology, which extracts all available data from the phone. Because Cellebrite extracts data in an unreadable format, a separate software program, Physical Analyzer, is then needed to sort and convert the data into a readable format.

Bucknall used Cellebrite to conduct a physical search of Macasaet's phone. However, Cellebrite returned an error message and was only able to extract a partial data set. Bucknall then attempted to run this partial data set through Physical Analyzer. However, Physical Analyzer was incompatible with Macasaet's cell phone model. Unable to proceed further, the troopers returned Macasaet's phone to the storage locker and retained the unreadable partial data on a network server.

Five months later, on January 9, 2017, Bucknall learned that Physical Analyzer had received a software update and was now compatible with Macasaet's cell phone model. Consequently, Bucknall accessed the partial data in electronic storage

– 10 –                                                                                                2798

and ran it through Physical Analyzer again. This time, Bucknall was successful. Physical Analyzer was able to convert the data into a readable format, and through this process, Bucknall discovered "texts, call logs, emails and multimedia information relevant to the case." He also recovered the phone's passcode.

On January 17, 2017, Dunford applied for a second warrant to search Macasaet's phone. This second warrant was identical in scope to the first warrant and contained a nearly identical probable cause statement. In his affidavit, Dunford explained that when the first warrant was executed, the police seized text messages, call logs, emails, and multimedia information relevant to the case. He then requested a new warrant authorizing the police to extract and analyze data from Macasaet's phone a second time. The district court granted this additional warrant as requested.

On February 3, 2017, Bucknall conducted a second search of Macasaet's cell phone. This time, he used three separate techniques to extract data: a "physical" search (which does not require the phone's passcode), a "file system" search (which requires the passcode), and a "logical" search (which also requires the passcode). Collectively, these searches yielded a large quantity of data. Using Physical Analyzer, Bucknall then processed this data and prepared a report that he provided to Dunford.

Macasaet moved to suppress the evidence obtained from the two search warrants. First, he argued that Bucknall conducted an illegal warrantless search on January 9, 2017, when he ran the partial data set through the updated Physical Analyzer software because the first search warrant (issued on August 4, 2016) was no longer valid.

Second, Macasaet argued that both warrants impermissibly permitted searches that were not supported by probable cause. Macasaet noted that the search warrant applications contained information that, on the morning of Guthrie's disappearance, he had sent text messages asking about her whereabouts to Wesley Allen Minch, who had been in the Hill Bar with them. The search warrant applications also indicated that Macasaet initially told police that he last saw Guthrie when she left the

bar with Minch and another woman. Macasaet conceded that the search warrant applications established probable cause to search his phone for "text messages," but he argued that the warrants were invalid with respect to all other categories of information on his phone, including "call logs," "photographs," "geolocation data," "voice recordings," "app data," "deleted call log entries or deleted text messages, search history," "web pages accessed," and "email and to document the cell phones by photographs." In response to questioning from the court, Macasaet took the position that if there was probable cause to search for a given category of data, such as "text messages," then evidence of that data need not be suppressed, even if the warrant was overbroad in other respects.

Third, Macasaet argued that the warrants could have "been limited in time as well as scope," suggesting that he believed that the warrant was insufficiently particular.

The superior court conducted an evidentiary hearing and then denied the motion to suppress. In its order, the court rejected Macasaet's claim that the warrant lacked probable cause. The court explained that around the time of Guthrie's murder, Macasaet "used his cell phone to call or text at least three people," and that the police therefore had probable cause to search "logs or records of voice or visual contacts, text contacts, photographic contacts, and geolocation . . . within Macasaet's phone." The court also found that text messages sent using Facebook's messaging capability fell within the scope of the probable cause. The court explained: "Facebook has messaging capability, and though not a program dedicated to messaging, police could properly search the site under the probable cause here."

With regard to "app data," the court construed this term to include phone applications that contained, managed, or enabled the other categories of information for which there was probable cause. The court pointed out that Macasaet had not identified any evidence that was outside of these categories, and also that he had agreed that "suppression would only lie for those items police seized for which probable cause was

lacking."[12] Because of this narrow interpretation of "app data," the court found that the warrant, including this provision, was sufficiently particular.

The superior court also concluded that the officers did not conduct a Fourth Amendment "search" when they ran the stored partial data set through Physical Analyzer following the software update.

At trial, the State introduced an exhibit detailing every message and phone call that Macasaet's phone sent or received during a twenty-one-hour window from July 30 to July 31, 2016 (shortly before and after Guthrie's death).[13] These communications included text messages and call logs from the phone's default messaging applications, as well as instant messages and call logs transmitted using the Facebook Messenger application.[14] The State also introduced an exhibit showing that Macasaet and Chelsi Sage had exchanged messages on July 28, 2016, using Facebook Messenger.

On appeal, Macasaet renews his challenges to the search warrants, contending that the superior court should have suppressed evidence of his communications using Facebook Messenger. In arguing that the warrants were invalid, Macasaet does not challenge the provision authorizing the search for his "text messages." However, he argues that the warrants lacked probable cause and that the provision of the warrants that authorized a search for "app data" was insufficiently particular.

---

[12] The superior court also determined that the term "app data" should be viewed in the context of Dunford's affidavit, and that, so construed, it had a sufficiently narrow meaning.

[13] The last communication in this exhibit was an outgoing phone call on July 31, 2016, at 5:55 p.m. when Macasaet called the Craig police to report finding Guthrie's body.

[14] Facebook Messenger is a proprietary instant messaging application developed by Meta that is used to send messages and exchange, *inter alia*, photos, audio, and video. *Features*, Messenger, https://www.messenger.com/features (last visited Feb. 3, 2025).

As we are about to explain, we have reviewed the search warrants and the warrant applications, and we agree with the superior court that the provision authorizing the search of "text messages" was a category that includes instant messages sent through Facebook Messenger and that this provision was particular and supported by probable cause. We also conclude that each of the searches that were conducted took place within the timeframe permitted by the warrants. And while we agree with Macasaet that the warrants were defective in some ways, we do not agree that the deficiencies required suppression of the Facebook Messenger messages.

*1.     The warrant provision authorizing a search of all of Macasaet's cell phone's "app data" was unlawful, but the Facebook Messenger messages were admissible based on the provision authorizing a search for "text messages"*

The United States and Alaska Constitutions prohibit the government from engaging in "unreasonable searches and seizures."[15] Prior to engaging in a search or seizure, the government ordinarily must obtain a warrant based on "probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[16] This requirement seeks to prevent government officials from having "unbridled discretion" over what should be searched or seized.[17]

In *Riley v. California*, the United States Supreme Court's seminal case involving cell phone searches, the Supreme Court explained that cell phone technology

---

[15]  U.S. Const. amend. IV; Alaska Const. art. I, § 14; *see* Alaska Const. art. I, § 22 ("The right of the people to privacy is recognized and shall not be infringed."); *State v. Gibson*, 267 P.3d 645, 659 (Alaska 2012) ("Alaska courts have used section 22's right to privacy to give section 14's protection against unreasonable searches and seizures 'a liberal interpretation.'" (quoting *Municipality of Anchorage v. Ray*, 854 P.2d 740, 750 (Alaska App. 1993))).

[16]  U.S. Const. amend. IV; Alaska Const. art. I, § 14.

[17]  *Namen v. State*, 665 P.2d 557, 560 (Alaska App. 1983).

increases law enforcement's ability to conduct a wide-ranging search into a person's private affairs.[18] The Supreme Court noted that modern cell phones are "minicomputers that also have the capacity to be used as a telephone."[19] It described cell phones as devices that "could just as easily be called cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers" that enable people to "keep on their person a digital record of nearly every aspect of their lives."[20]

Similarly, in *Pohland v. State*, this Court stated that "[p]ortable computing devices" (laptops, tablets, and smart phones) "will often offer a compendium of that person's family and social life, their private and business interests, their recreational activities, and their intimate thoughts."[21] We explained that "[t]he prevalence of these digital devices has caused courts to re-think the contours of the Fourth Amendment's prohibition against unreasonable searches and seizures."[22] And more recently, in *Chandler v. State*, we again acknowledged the "uniquely important role that computing devices have assumed in the personal lives of most citizens," observing that "courts are beginning to recognize these devices may be entitled to special Fourth Amendment protections."[23]

Relying on this line of cases, Macasaet asserts that cell phone search warrants must be carefully tailored so that they do not authorize a general exploratory

---

[18] *See Riley v. California*, 573 U.S. 373, 393-97 (2014).

[19] *Id.* at 393.

[20] *Id.* at 393, 395.

[21] *Pohland v. State*, 436 P.3d 1093, 1098 (Alaska App. 2019).

[22] *Id.*; *see also United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (explaining that the particularity requirement is of increased importance in the context of personal computer searches).

[23] *Chandler v. State*, 487 P.3d 616, 629 (Alaska App. 2021).

search of the vast array of data that may be found on a cell phone. He also contends that the provision of the warrants that authorized the police to search for "app data" on his phone lacked probable cause and was insufficiently particular. We agree with these contentions.

The warrants in this case permitted the police to search all "app data" — *i.e.*, all cell phone application data — on Macasaet's cell phone. Cell phone applications, which are commonly referred to as "apps," are broadly defined as types of software designed for use on smartphones and tablets.[24] "Users access e-mail messages, calendars, photographs, files, notes, and other personal data on all their devices — phones, computers, and tablets — via mobile apps."[25] Thus, cell phone data that is specific to the user will be found in the phone's application data.[26] For this reason, when a warrant authorizes the search of all application data contained within a cell phone, the resulting search is akin to a search of the entire cell phone.

---

[24] Adam Volle, *app: mobile device software*, Britannica, https://www.britannica.com/technology/mobile-app (last updated Jan. 23, 2025).

[25] Brief of Amicus Curiae Electronic Privacy Information Center (EPIC) et al. In Support of Petitioner at 11, *Riley v. California*, 573 U.S. 373 (2014) (No. 13-132); Adam Volle, *app: mobile device software*, Britannica, https://www.britannica.com/technology/mobile-app (last updated Jan. 23, 2025).

[26] Application data includes, for example, user demographics, voice and text communications, internet search history, application usage patterns, medical information, financial information, location data, and possibly even data relating to bodily functions tracked via smartwatches like heartbeat and blood pressure history. *See* Brief of Center for Democracy & Technology and Electronic Frontier Foundation as Amici Curiae in Support of Petitioner in No. 13-132 and Respondent in No. 13-212 at 9-12, *Riley v. California*, 573 U.S. 373 (2014) (Nos. 13-132, 13-212); Brief of the Center for Democracy and Technology as Amicus Curiae in Support of Petitioner at 9, *Carpenter v. United States*, 585 U.S. 296 (2018) (No. 16-402) ("[M]ore than one million apps extend far beyond health and finance to cover every conceivable need and interest — from politics, to addiction treatment, to romance and shopping.").

In Macasaet's case, the police did not have probable cause to search the entire contents of Macasaet's cell phone. As the United States Supreme Court explained in *Riley*, modern cell phones are more than communication devices; they function as "cameras, video players, rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers."[27] And, as we have just explained, in order to perform these functions, cell phones contain a broad array of applications which contain an enormous amount of data about the cell phone's user. Here, the superior court correctly determined that the search warrant established probable cause that evidence of Guthrie's homicide would be found within the applications of Macasaet's phone used for text messaging, voice calling, location tracking, photography, and videorecording. However, the warrant did not establish probable cause that evidence of Guthrie's homicide would be found within applications used to perform the other diverse functions of the phone.

We also conclude that the warrant provision authorizing the search of "app data" was insufficiently particular. To pass constitutional muster, a warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized."[28] We accordingly have held that when a warrant authorizes the search of a digital storage device, it must "provide a reasonably specific description of the material that the police can search for within the device."[29]

This requirement applies to a warrant to search cell phones. Given the vast array of information that can be found within modern "smartphones," a warrant authorizing the search of a cell phone, or of the data contained in a cell phone, must provide a sufficiently precise description of the type of data that the police are permitted

---

[27]  *Riley*, 573 U.S. at 393.

[28]  U.S. Const. amend. IV; Alaska Const. art. I, § 14.

[29]  *Pohland v. State*, 436 P.3d 1093, 1100 (Alaska App. 2019).

to examine — *i.e.*, the "place" within the cell phone that the police may search — and also of the type of data that the police are authorized to seize — *i.e.*, the "things" to be seized.[30] When a warrant does not provide such a description and instead authorizes the search of all application data contained within a cell phone, the resulting search does not meet the particularity required by the Fourth Amendment.[31]

We thus conclude that the provision of the warrants authorizing a search for "app data" lacked probable cause and was insufficiently particular. We must next consider Macasaet's related argument that, because the provision authorizing a search for "app data" was invalid, the evidence obtained from his phone's Facebook Messenger application was inadmissible at his trial.

If this unlawful provision was the only provision of the warrant that authorized a search for Facebook Messenger messages, we would agree with Macasaet's argument. But the search for these messages was also authorized by the

---

[30] *Ridenour v. State*, 539 P.3d 530, 539-40 (Alaska App. 2023); *State v. Wilson*, 884 S.E.2d 298, 300 (Ga. 2023) (invalidating a search warrant that provided a "limitless authorization to search for and seize any and all data that can be found on [] cell phones"); *State v. Smith*, 278 A.3d 481, 251-52 (Conn. 2022) (concluding that the particularity requirement of the Fourth Amendment invalidated a warrant which allowed for a search of the entire contents of a cell phone because it did not limit the search by describing the areas within the phone to be searched or a time frame reasonably related to the crimes); *Richardson v. State*, 282 A.3d 98, 124 (Md. 2022) (holding that it is not reasonable for a warrant to authorize police to search everything on a cell phone); *People v. Coke*, 461 P.3d 508, 516 (Colo. 2020) (invalidating a search warrant that allowed police to search "all texts, videos, pictures, contact lists, phone records, and any data that showed ownership or possession"); *State v. Bock*, 485 P.3d 931, 936 (Or. App. 2021) (concluding that a warrant authorizing seizure of any item on a cell phone that might later serve as circumstantial evidence of a crime is tantamount to a general warrant). *See generally* Adam M. Gershowitz, *The Post-Riley Search Warrant: Search Protocols and Particularity in Cell Phone Searches*, 69 Vand. L. Rev. 585, 601-02 (2016) (explaining that while "any and all" data warrants are usually invalid, this broad language may be acceptable in cases where the type of evidence that the police are seeking could be hidden anywhere on the phone).

[31] *See generally* Gershowitz, *supra* note 30, at 600-01.

provision of the warrants that allowed police to search for "text messages." Macasaet's argument that his Facebook Messenger messages should have been suppressed is based in part on his view that the challenged messages were not "text messages." But in this case, the superior court found that the affidavit established probable cause to search applications containing text messages and that, because Facebook has messaging capabilities, the probable cause extended to such messages.

The record supports the superior court's finding. During the evidentiary hearing, Dunford explained that text messages may be sent through many different cell phone applications. According to Dunford, "text messages" can be sent through applications such as Facebook, WhatsApp, and Kik. In response to questioning from the court and the prosecutor, Dunford explained that the Facebook application

> works just like any other app service where you can send a text message or a message through Facebook and it shows up in the other person's Facebook account. They click on it and they see the message, and they can carry on a conversation in that same window.

He further testified that Facebook text messages would be transmitted from phone to phone, and that

> [t]here's all kinds of different programs that allow you to communicate through different medi[ums]. I mean, take WhatsApp. WhatsApp is a type of application that allows you to communicate from one person to the other via text and you can send photos through WhatsApp. Skype is another. There's — there's — as long as you have a data connection or connected Wi-Fi or you have a phone that's connected to a cellular network that has data capability you can use those types of apps.

Dunford's description comports with the common use of the term "text message"[32] to refer to any short electronic communication sent from one cell phone to another by typing words.[33] Although the phrase "text message" may have originally referred to messages sent from one phone to another via cellular connection, the prevalence of messaging applications (including Facebook Messenger) that use an internet connection has changed our everyday understanding of the term.[34] As Dunford explained, text messages are often sent through a phone's default messaging application, but they may also be sent through other applications. Thus, we agree with the superior court's finding that the affidavit supporting the warrant established probable cause to search the messages on Macasaet's phone that were sent through the Facebook Messenger application.[35]

---

[32] *See State v. Chapman*, 783 P.2d 771, 772 (Alaska App. 1989) (explaining that when interpreting search warrants, evidence supporting the warrant must be considered in a reasonable and commonsense manner).

[33] *Text message*, Merriam-Webster, https://www.merriam-webster.com/dictionary /text%20message (last updated Dec. 16, 2024) ("[A] short message sent electronically usually from one cell phone to another."); *Text message*, Cambridge Dictionary https://dictionary.cambridge.org/us/dictionary/english/text-message# (last visited Feb. 3, 2025) ("[A] written message, often containing short forms of words, sent from one cell phone or pager to another.").

[34] *See* Youngjin Choi, *Mobile Instant Messaging Evidence in Criminal Trials,* 26 Cath. U. J. L. & Tech 1, 1-8 (2017); Karen Church & Rodrigo de Oliveira, *What's up with WhatsApp? Comparing Mobile Instant Messaging Behaviors with Traditional SMS*, *in* Proceedings of the 15th international conference on Human-computer interaction with mobile devices and services 352, 352-53, 360 (2013); Victoria Shannon, *15 years of text messages, a 'cultural phenomenon,'* N.Y. Times (Dec. 5, 2007), https://www.nytimes.com/2007/12/05/technology/05ihtsms.4.8603150.html?searchResult Position=1.

[35] *See State v. Koen*, 152 P.3d 1148, 1151 (Alaska 2007) (explaining that although an appellate court ultimately exercises independent review in assessing whether a warrant is supported by probable cause, the appellate court must give "great deference" to the issuing

Indeed, while Macasaet asserts that the "app data" provision of the warrant was invalid, he agrees that the warrant application contained probable cause to search messages contained on the cell phone's default text messaging application. Further, during the trial court proceedings, Macasaet also agreed that that the warrant established probable cause to search for his "text messages."

This is important because all federal circuit courts, as well as many state courts, have applied the severability doctrine, whereby the invalid parts of an overbroad warrant are severed from the valid parts and suppression is only required for those items seized pursuant to the invalid parts.[36] Alaska's appellate courts have not previously

court's discretion and will "revolve marginal cases in keeping with the traditional preference accorded to warrants").

[36] *See In re Search Warrant Dated July 4, 1977*, 667 F.2d 117, 133 (D.C. Cir. 1981); *United States v. Riggs*, 690 F.2d 298, 300-01 (1st Cir. 1982); *United States v. George*, 975 F.2d 72, 79 (2d Cir. 1992); *United States v. Christine*, 687 F.2d 749, 759 (3d Cir. 1982); *United States v. Jacob*, 657 F.2d 49, 52 (4th Cir. 1981); *United States v. Cook*, 657 F.2d 730, 735 (5th Cir. 1981); *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir. 1991); *United States v. Reed*, 726 F.2d 339, 342 (7th Cir. 1984); *United States v. Fitzgerald*, 724 F.2d 633, 636 (8th Cir. 1983); *United States v. Gomez-Soto*, 723 F.2d 649, 654 (9th Cir. 1984); *United States v. Brown*, 984 F.2d 1074, 1077-78 (10th Cir. 1993); *United States v. Wuagneux*, 683 F.2d 1343, 1354 (11th Cir. 1982); *see also United States v. Giresi*, 488 F. Supp. 445, 459 n.17 (D.N.J. 1980) (listing numerous state cases that support the severability doctrine).

Many courts have also held that there are limits to the applicability of the severability doctrine. *See, e.g.*, *United States v. Naugle*, 997 F.2d 819, 822 (10th Cir. 1993) (severability doctrine is only applicable if the valid portions of the warrant are sufficiently particularized, distinguishable from the invalid portions, and make up the greater part of the warrant); *Aday v. Alameda County*, 362 P.2d 47, 52 (Cal. 1961) (invalid portions of a warrant are not severable under all circumstances, and courts thus will not tolerate an abuse of the warrant procedure whereby wholesale seizures are made pursuant to warrants that are essentially general in character, but meet the requirement of particularity as to minor items); *Thomas v. State*, 305 A.3d 683, 701 (Del. 2023) (holding that if a court determines that a warrant is general, it must suppress all evidence obtained pursuant to it, but if the warrant is overbroad, the trial court may narrow it to strike out those portions of the warrant that are invalid for lack of probable cause).

determined whether and to what extent the severability doctrine applies to overbroad search warrants.[37]

But in this case, during the evidentiary hearing on Macasaet's motion to suppress, the superior court asked Macasaet what remedy he should be afforded if some, but not all, of the warrant was constitutionally invalid. In response, Macasaet's attorney stated that Macasaet would only be entitled to suppression of evidence obtained from parts of the warrant that were invalid. In other words, Macasaet's defense attorney directly conceded during the superior court proceedings that, even if the warrant were overbroad, the invalid portions were severable from the valid portions. Given this procedural posture, we will assume, for purposes of this appeal, that the severability doctrine applies. We therefore conclude that the court did not err in denying Macasaet's motion to suppress these messages.

We take this opportunity, however, to again emphasize that law enforcement officers and judges should exercise great care in drafting and ratifying a search warrant's description of the places and things to be searched for and seized, particularly in the context of searches of digital computing and storage devices where "the likelihood of the seizure of innocent articles by mistake is the most substantial."[38]

---

We need not determine the applicability or scope of this doctrine given Macasaet's concession in the superior court proceedings that it applies here.

[37] *Cf. O'Connor v. State*, 2019 WL 1579688, at \*4 (Alaska App. Apr. 10, 2019) (unpublished) (noting that the defense attorney had acknowledged that although the warrant authorized the seizure of items for which there was no probable cause, this did not invalidate the entire warrant).

[38] *Pohland v. State*, 436 P.3d 1093, 1100 (Alaska App. 2019) (internal quotation marks and citation omitted).

*2. Officers conducted the search of the phone within thirty days as required by the warrant when they extracted the data from the phone; their review of the data five months later did not violate the Fourth Amendment*

Macasaet next argues that the superior court should have granted his motion to suppress the Facebook Messenger messages because Bucknall conducted a warrantless search on January 9, 2017, when he ran the previously extracted data from Macasaet's cell phone through Physical Analyzer. Macasaet points out that the search warrant issued on August 4, 2016, required law enforcement to "make the search" within thirty days.[39] Bucknall nevertheless reviewed the data using Physical Analyzer software a full five months later, on January 9, 2017. Macasaet contends that when Bucknall conducted this review of the data, he conducted an untimely "search" after the warrant had expired, in violation of the Fourth Amendment.

When the superior court denied Macasaet's motion to suppress, it characterized Bucknall's use of Physical Analyzer in January as a "re-examination" of the data, rather than a new "search" of Macasaet's cell phone that required its own warrant. Under the court's interpretation, the police seized Macasaet's cell phone when they confiscated it at the crime scene, searched the cell phone when they removed extractable data from it using the Cellebrite device, and took action that was neither a seizure nor a search when they later analyzed the data using the Physical Analyzer software program.

We agree with the superior court that when the police used Physical Analyzer software to examine the previously-extracted cell phone data, they did not violate the Fourth Amendment. The data that was reviewed by the police had been transferred from Macasaet's cell phone to a police server months before the review took

___

[39] Alaska R. Crim. P. 37(a)(3)(B). Under this rule, a search warrant must "command the officer to search the person or place named for the property specified within a reasonable period not to exceed 30 days of the issuance of the warrant."

place. At the time Bucknall conducted the review, the cell phone remained in a police storage locker, and Bucknall did not conduct any further examination of the phone itself; his actions only involved examining the data that had been extracted in August. And before the police extracted any additional data from the cell phone, they applied for and received a second warrant to conduct a second search for data on the cell phone.

A majority of courts considering this issue have determined that the police do not violate constitutional prohibitions against unreasonable searches and seizures if they fail to conduct a forensic analysis of a seized electronic computing device, or data taken from the device, within the prescribed period for executing a search warrant — as long as the device itself was seized, and its data was extracted, within this prescribed time.[40] Because we agree with the reasoning of these courts, we reject Macasaet's claim

---

[40] *E.g.*, *United States v. Jarman*, 847 F.3d 259, 267 (5th Cir. 2017) (explaining that "a delay of several months or even years 'between the seizure of electronic evidence and the completion of the government's review of [it] . . . is reasonable' and does not render the warrant stale"); *State v. Sanchez*, 476 P.3d 889, 893 (N.M. 2020) (holding that, although a warrant is executed when the search or seizure authorized by that warrant is conducted, a search warrant for information stored on an electronic device is executed for purposes of the criminal rules when the device is seized or when the data stored on the device is copied on site); *Commonwealth v. Bowens*, 265 A.3d 730, 751 (Penn. 2021) (deeming a warrant for the search of a cell phone to be "executed" upon seizure of the phone); *see also United States v. Beckmann*, 786 F.3d 672, 680-81 (8th Cir. 2015) (concluding that suppression of the evidence was not required even if the police violated the rule requiring the search of an electronic device to be completed within a set time where the police did not exhibit reckless disregard for the proper procedure in light of the length of time typically required to conduct computer analyses); *United States v. Syphers*, 426 F.3d 461, 469 (1st Cir. 2005) (noting that courts have permitted some delay in the execution of search warrants involving computers because of the complexity of the search and concluding that suppression was not warranted if the delay did not cause a lapse in probable cause or prejudice to the defendant, unless the officers acted in bad faith); 2 Wayne R. LaFave, *Search and Seizure* § 4.7(a), at 812 n.21 (6th ed. 2024) (explaining that courts generally have not applied constitutional protections to the off-site analysis of computer data); Orin S. Kerr, *Search Warrants in an Era of Digital Evidence*, 75 Miss. L.J. 85, 86, 120 (2005) (explaining that the law governing the warrant process fails to account for the bifurcated process of obtaining digital evidence, making it difficult to determine when delays in forensic processing render a seizure unreasonable).

that the police violated the Fourth Amendment when they examined the electronic data at a time that was outside of the time limit set by Alaska Criminal Rule 37(a)(3)(B) and incorporated into the search warrant at issue in this case.

This does not mean that the police have an unlimited amount of time to examine digital data that is extracted from a cell phone or that they are free to examine such data in order to obtain evidence that is outside of the scope of the initial warrant.[41] When a search is conducted under the authority of a search warrant, the affidavit that justified the issuance of the warrant must be based on facts that are "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that

---

[41] *See State v. McDonnell*, 297 A.3d 1114, 1119 (Md. 2023) ("In this case, we conclude that . . . Respondent[] had a reasonable expectation of privacy in the data contained on his hard drive . . . . We hold that, because the government did not examine the data before he withdrew his consent, Mr. McDonnell did not lose his reasonable expectation of privacy in the data, and the examination of the data was a search. As such, we conclude that the government conducted an unreasonable search by examining the data without any authority to do so, by a warrant or an exception to the warrant requirement."); *People v. McCavitt*, 185 N.E.3d 1192, 1197 (Ill. 2021) ("When defendant was acquitted of the sexual assault, his reasonable expectation of privacy in his data relating to that offense was restored. However, the acquittal did not resolve the portion of the warrant that authorized a search for digital evidence of the unauthorized video recording. The post acquittal computer examination was reasonably directed at obtaining evidence of the unauthorized video recording, and the child pornography that was uncovered during the search was admissible because the images were found in plain view."); *People v. Hughes*, 958 N.W.2d 98, 115 (Mich. 2020) ("In summary, the search and seizure of defendant's cell-phone data pursuant to a warrant in the drug-trafficking case did not altogether eliminate his reasonable expectation of privacy in that data. Rather, the police were permitted to seize and search that data, but only to the extent authorized by the warrant. Any further review of the data beyond the scope of that warrant constitutes a search that is presumptively invalid under the Fourth Amendment, absent some exception to that amendment's warrant requirement."); *see also Chandler v. State*, 487 P.3d 616, 619 (Alaska App. 2021) ("So long as the Troopers confined their search to the boundaries authorized by the conditions of Chandler's probation, they did not need this search warrant to authorize their continued possession of, and search of, Chandler's computers.").

time."[42] For this reason, a search is constitutionally valid only if it is executed before the probable cause upon which the warrant was based has dissipated (*i.e.*, before the warrant has become stale).[43] In order for an examination of previously-extracted data to pass constitutional muster, the examination must also be conducted before the probable cause upon which the warrant was based has dissipated.[44]

To determine whether the information offered in support of a warrant has become stale, "[t]he mere lapse of substantial amounts of time is not controlling."[45] Instead, staleness is evaluated "in light of the particular facts of the case and the nature of the criminal activity."[46] The appropriate inquiry is whether "there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises."[47]

---

[42]   *Sgro v. United States*, 287 U.S. 206, 210 (1932); *see Szajer v. City of Los Angeles*, 632 F.3d 607, 612 (9th Cir. 2011); *United States v. Doyle*, 650 F.3d 460, 474 (4th Cir. 2011); *United States v. Church*, 823 F.3d 351, 356 (6th Cir. 2016); *United States v. Jenkins*, 984 F.3d 1038, 1044 (D.C. Cir. 2021).

[43]   *See generally* 2 Wayne R. LaFave, *Search and Seizure* § 4.7(a), at 812 (6th ed. 2024) (collecting cases and explaining that warrants that are executed outside the time limit provided by the court are unconstitutional if the probable cause upon which they are based has dissipated).

[44]   *See id.*; *McCavitt*, 185 N.E.3d at 1213 ("A search of digital data that takes several years may be reasonable as long as the search ends before trial and does not exceed the scope of the original search warrant.").

[45]   *Cornel v. Hawaii*, 37 F.4th 527, 533 (9th Cir. 2022); *United States v. Alvarez*, 358 F.3d 1194, 1203 (9th Cir. 2004) ("The mere lapse of substantial amounts of time is not controlling" where "the ongoing nature of a crime might lead to the maintenance of tools of the trade." (quoting *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988))); *United States v. Lacy*, 119 F.3d 742, 745 (9th Cir. 1997) (quoting *Dozier*, 844 F.2d at 707).

[46]   *Cornel*, 37 F.4th at 533 (quoting *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir. 1993)).

[47]   *United States v. Gann*, 732 F.2d 714, 722 (9th Cir. 1984).

In Macasaet's case, when the police applied for the first warrant to search his cell phone, Dunford's affidavit informed the court that Macasaet's cell phone was being held at the Technical Crimes Unit's evidence storage facility. As other courts have recognized, when cell phone data rests in the custody of the police and not of the suspect, the basis for the probable cause determination is unlikely to have changed.[48] Here, the police initially extracted the data from Macasaet's phone within the time limit required by Alaska Criminal Rule 37 and stored it on a secure police server. Thus, although the forensic examination of the data did not occur until months later, the data that was examined could not have changed, and the probable cause that supported the issuance of the warrant continued to exist.[49] Because the delay in examining the data did not result in a search that was conducted after the probable cause had dissipated, the superior court did not err in declining to suppress the evidence.[50]

---

[48] *E.g.*, *Commonwealth v. Knoble*, 188 A.3d 1199, 1206-07 (Pa. Super. 2018); *Commonwealth v. Ericson*, 10 N.E.3d 127, 132-33 (Mass. App. 2014); *Wolf v. State*, 266 P.3d 1169, 1174-75 (Idaho App. 2011); *State v. Grenning*, 174 P.3d 706, 713-14 (Wash. App. 2008); *State v. Sanchez*, 476 P.3d 889, 894-95 (N.M. 2020).

[49] We also note that Dunford's affidavit provided a detailed explanation of the "highly technical" process for conducting a forensic analysis of a cell phone. The affidavit also explained that it could take "weeks or months" to fully sort through the data that was extracted from the phone. Thus, when the court issued the warrant authorizing the forensic analysis of Macasaet's cell phone, it understood that the authorities would first copy the digital data that was on the phone and then examine it, and that this process that would take "weeks or months." Under these circumstances, it is reasonable to view the court's directive to "make the search . . . within thirty days" as requiring the police to complete the initial extraction of data from the cell phone within thirty days, rather than requiring the police to complete their examination of the extracted data within that time limit.

[50] Macasaet also suggests that evidence from the search should be suppressed because, after the police seized his cell phone, they continued to hold it for over five months. But even if the police retained his phone for an unconstitutionally long period of time, this would not result in the suppression of any evidence as the police did not search his phone again until they obtained a second warrant (and Macasaet did not argue on appeal that the search conducted pursuant to this second warrant was untimely, nor did he ask the trial court to suppress "text messages" found pursuant to that search).

Our conclusion is consistent with the procedure for cell phone search warrants promulgated by the United States Supreme Court.[51] Although the Fourth Amendment contains no requirements about when a search or seizure is to occur or its duration, Federal Rule of Criminal Procedure 41(e)(2)(A) provides that a duly issued warrant shall be executed within a specified period not to exceed fourteen days.[52] A separate provision of the rule, Federal Rule 41(e)(2)(B), governs warrants seeking electronically stored information. Under this provision, the seizure and onsite copying of the electronic data must occur within the fourteen-day period, but later review of the information is permissible:

> Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. The time for executing the warrant . . . refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.[53]

The Advisory Committee's notes on the 2009 amendments to the Federal Rules of Criminal Procedure recognized that "practical considerations necessitate that a warrant's execution date govern only the date by when the seizure of the device, or, alternatively, on-site copying of the device, must occur, and not when off-site investigation and analysis of its contents must be completed."[54] The Advisory Committee stated:

---

[51]  *See* Fed. R. Crim. P. 41(e)(2).

[52]  As we have explained, the Alaska counterpart to this rule, Alaska Rule of Criminal Procedure 37(a)(3)(B) requires that the search must be conducted within thirty days of the issuance of the warrant.

[53]  Fed. R. Crim. P. 41(e)(2)(B).

[54]  *United States v. Cleveland*, 907 F.3d 423, 430 (6th Cir. 2018) (discussing the advisory committee's notes on the 2009 amendment to Federal Rule of Criminal Procedure 41).

This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.

. . . .

While consideration was given to a presumptive national or uniform time period within which any subsequent off-site copying or review of the media or electronically stored information would take place, the practical reality is that there is no basis for a "one size fits all" presumptive period. A substantial amount of time can be involved in the forensic imaging and review of information. This is due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs. The rule does not prevent a judge from imposing a deadline for the return of the storage media or access to the electronically stored information at the time the warrant is issued. However, to arbitrarily set a presumptive time period for the return could result in frequent petitions to the court for additional time.[55]

Thus, while courts are not constitutionally required to set time limits for the review of electronic data, and uniform time limits may not be practical, time limits nevertheless are useful prophylactics against examining data after the warrant that authorized the extraction of the data has become stale. Indeed, the longer the police wait before examining extracted data, the more likely it is that the situation will change so that facts which supported the issuing court's determination of probable cause will no longer exist.

We accordingly recommend that, in order to avoid confusion about the scope of the court's grant of authority to law enforcement officers to seize and analyze electronic data, trial courts should consider setting reasonable case-specific time limits for completing the extraction and review of the data. As we have explained, under

---

[55]   Fed. R. Crim. P. 41 advisory committee's notes to 2009 amendment.

Alaska Criminal Rule 37, the police must complete the original extraction, seizure, or on-site copying of the data within a maximum of thirty days. But courts have the authority to set a shorter deadline for completion of this task, and they also have the authority to set a deadline for completion of the analysis of the extracted data.[56] If the police are unable to complete these tasks within deadlines set by the court, they may seek an extension of time from the trial court by establishing that there continues to be probable cause to believe that evidence will be located within the data.

> 3. *Although the search warrant in this case did not contain an adequate temporal limit, suppression of the text messages is not required under the facts of this case*

On appeal, Macasaet suggests that, in order to satisfy the Fourth Amendment's particularity requirement, a cell phone search warrant must restrict the search to data that was generated within a time window that has specific relevance to the evidence sought. Macasaet notes that the warrant provision allowing for a search of the data from his phone "had no temporal limit" — *i.e.*, no date restriction regarding the data that could be seized. We agree with Macasaet that to pass constitutional muster, a warrant to search a cell phone usually must contain some temporal restriction.[57]

---

[56] *See* Alaska R. Crim. P. 53 (permitting courts to relax or dispense with rules "in any case where it shall be manifest to the court that a strict adherence to them will work injustice").

[57] *See, e.g.*, *Commonwealth v. Snow*, 160 N.E.3d 277 (Mass. 2021) (to be sufficiently particular, a warrant for a cell phone search presumptively must contain some temporal limit); *Richardson v. State*, 282 A.3d 98, 119 (courts commonly should consider imposing a temporal limit when issuing a cell phone search warrant); *United States v. McCall*, 84 F.4th 1317, 1327 (11th Cir. 2023), *cert. denied*, 144 S. Ct. 1042 (2024) (holding that there are generally two types of limitations that can adequately particularize a warrant for electronically stored information: (1) imposing a restriction on the subject matter of the data that may be examined, or (2) imposing a temporal restriction on the information to be searched).

The permissible temporal parameter for a cell phone search is a fact-intensive inquiry that typically must be resolved based on the particular facts of each case. Thus, we ordinarily would remand this matter to the superior court for "determination whether each piece of proffered evidence would have fallen within a reasonable temporal limit" — *i.e.*, a time window for which the police had probable cause to believe they would find evidence of the target crime.[58]

But in this case, the messages that the State introduced at trial were sent or received within the three days surrounding Guthrie's death.[59] And Macasaet concedes that, with respect to the provision authorizing a search for the text messages on his cell phone, the warrant was particular and supported by probable cause. Further, Macasaet does not argue that the time window during which the challenged Facebook Messenger messages were transmitted — within three days of Guthrie's death — was overly expansive. Because the messages admitted at trial were sent or received close to Guthrie's death, we need not order a remand, and we instead affirm the superior court's order denying Macasaet's motion to suppress.

*Why we conclude that the superior court erred in denying Macasaet's motion to suppress his statements*

On August 2, 2016, two days after Guthrie's body was recovered, Macasaet drove to the Alaska State Trooper station at 10:00 a.m. and voluntarily submitted to an interview. Although Macasaet was not under arrest at this time, he was aware that he was a suspect in the investigation into Guthrie's death.

---

[58] *Snow*, 160 N.E.3d at 289.

[59] In fact, other than the messages between Macasaet and Sage about meeting at the Black Bear Diner, all of the messages were sent or received within a twenty-one-hour time window.

Investigator Dunford and Sergeant Grant Miller interviewed Macasaet in the station breakroom. During this interview, Dunford did most of the talking. Both troopers were armed, but only Miller was wearing his full uniform.

Dunford began by advising Macasaet that, although the breakroom door was closed, it was not locked and Macasaet was free to leave anytime. He then questioned Macasaet for approximately one hour about his relationship with Guthrie and the events surrounding her disappearance. The superior court found that this exchange was "non-accusatory, polite and respectful," and Macasaet concedes that he was not subject to custodial interrogation during this initial part of the interview.

After an hour of questioning, Dunford informed Macasaet that he had a search warrant to collect biological samples from Macasaet and document any physical injuries. Macasaet asked Dunford why the troopers' investigation was only focused on him. In response, Dunford acknowledged that Macasaet was a suspect because the police learned that he had a history of strangling Guthrie. Dunford then asked Macasaet some questions about these past instances of violence.

After discussing these past incidents, Dunford re-directed the conversation back to the forthcoming execution of the search warrant, which he described as a "very invasive" process. Dunford previewed that the warrant authorized him to swab Macasaet's fingers, fingernails, hands, mouth, and penis; photograph Macasaet's body; and seize oral prescription medications and digital devices. Hearing this, Macasaet asked whether Dunford planned to seize the cell phone he was using, which belonged to his nephew (the police had seized Macasaet's cell phone two days earlier). Dunford replied that he needed to examine the phone before determining whether to seize it. Macasaet handed the phone over to the troopers and provided its passcode.

Dunford then conducted the search of Macasaet's body, a process that took just under thirty minutes. Macasaet was not shackled or handcuffed during this time. However, Dunford told Macasaet that he was not free to leave while the warrant

was being executed. The trial court later found that, while Dunford executed the warrant, Dunford and Macasaet "interacted convivially," and Macasaet "readily complied" with each verbal order he received. These orders required Macasaet to remove clothing; drop to his knees; submit to touching and photographing of his penis and scrotum; and submit to combing and plucking of his pubic hair.

After the search process was complete, Dunford told Macasaet that he could leave at any time. However, Dunford did not return the cell phone Macasaet was using or clarify when it would be returned. When Macasaet asked Dunford if he could get the cell phone back, Dunford responded that he needed to discuss the phone issue with his colleague, and that he would "kick [Macasaet] loose" afterwards. Dunford then left the breakroom. When Dunford returned to the room, Macasaet immediately asked, "You guys talk about my nephew's phone?" However, Dunford did not provide Macasaet with any update or timetable for when the phone would be returned. Rather, Dunford replied, "we'll get to that," and proceeded to ask Macasaet more questions about Guthrie.

Macasaet remained in the room and answered Dunford's additional questions. This "recap" — which was largely cumulative of the first hour of questioning — lasted for approximately twenty-two minutes. Once the recap was over, Dunford told Macasaet that they would "be in touch," and made plans to speak with Macasaet again later that day. The police returned the phone at the very end of the interview, and Macasaet then left the police station.

Macasaet moved to dismiss all statements he made after the execution of the search warrant. Macasaet argued that because he was subjected to custodial interrogation, the police should have provided him *Miranda* warnings. The superior court ruled that Macasaet was not in "custody" at any time for purposes of *Miranda*. Reviewing the transcript and recording of Macasaet's interview, the court concluded that the police "did nothing particularly intimidating that would cause a reasonable

person in Macasaet's position to believe they were not free to stop answering questions" and that "Macasaet knew that he would be free to leave once the search was over."

The court declined to suppress any part of Macasaet's interview, including statements Macasaet made when he was temporarily seized while the warrant was being executed. In reaching this ruling, the superior court acknowledged that Macasaet's freedom of movement was restricted while the warrant was executed.

On appeal, Macasaet argues that he was in "custody" while Dunford executed the search warrant, and afterward, when Dunford continued to question Macasaet without returning his nephew's cell phone.

The Fifth Amendment to the United States Constitution guarantees that no person "shall be compelled . . . to be a witness against himself" in any criminal case or proceeding.[60] In *Miranda v. Arizona*, the Supreme Court interpreted the Fifth Amendment to require that, before the police subject a person to custodial interrogation, the person must be advised of the privilege against self-incrimination and their right to an attorney.[61] The Alaska Supreme Court has held that Article I, Section 9 of the Alaska Constitution requires at least the same.[62]

---

[60]   U.S. Const. amend. V; *see also* Alaska Const. art. I, § 9.

[61]   *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Beagel v. State*, 813 P.2d 699, 705-06 (Alaska App. 1991) ("In order for a person's *Miranda* rights to be triggered, the statements must be the product of both custody and interrogation.").

[62]   *Munson v. State*, 123 P.3d 1042, 1047 (Alaska 2005) ("We begin our analysis with the words of the Fifth Amendment to the United States Constitution and article I, section nine of the Alaska Constitution, both of which guarantee that no person 'shall be compelled in any criminal [case or proceeding] to be a witness against himself.' These simple words form the basis of a criminal defendant's rights to counsel and to remain silent. While the core protection is a prohibition on compelling a defendant to testify against himself at trial, *Miranda* and our own cases under the Alaska Constitution show that this protection is enforceable in any setting where a suspect is subject to custodial police interrogation."); *see also State v. Smith*, 38 P.3d 1149, 1154 (Alaska 2002); *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979).

In the present case, Macasaet was undisputedly subjected to an "interrogation" — *i.e.*, words or actions by the police that are "reasonably likely to elicit an incriminating response."[63] However, the parties dispute whether Macasaet was in "custody" when this interrogation occurred.

When evaluating whether a person is in *Miranda* custody, the trial court must engage in a two-step process. First, the court must evaluate the totality of the circumstances surrounding the interrogation and make all factual findings relevant to its analysis.[64] Second, the court must determine whether an objectively reasonable person faced with those circumstances would have felt free to terminate the questioning and leave.[65] A defendant is in custody when "a reasonable person would feel [they] w[ere] not free to leave and break off police questioning"[66] because they were subject to a "restraint on freedom of movement of the degree associated with a formal arrest."[67]

The Alaska Supreme Court has found three groups of factors salient to determining whether a person was in custody for purposes of *Miranda*: (1) events that occurred *before* the interrogation; (2) the circumstances of the *interrogation itself* (including the time, duration, and location of questioning; the number of police present;

---

[63] *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (defining an "interrogation" as words or actions by the police that are "reasonably likely to elicit an incriminating response"); *see Klemz v. State*, 171 P.3d 1169, 1172 (Alaska App. 2007) (holding that the probation officer's questions subjected the defendant to custodial interrogation because the questions were reasonably likely to elicit an incriminating response).

[64] *Smith*, 38 P.3d at 1154.

[65] *Hunter*, 590 P.2d at 895 (agreeing that the objective "reasonable person" test is the proper standard for determining custody); *Smith*, 38 P.3d at 1154 (explaining that the "reasonable person" test is the second step in determining custody for *Miranda* purposes) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

[66] *Smith*, 38 P.3d at 1154 (quoting *Hunter*, 590 P.2d at 895).

[67] *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)).

the presence of actual physical restraints or their equivalent; and whether the defendant was questioned as a suspect or a witness); and (3) and events that occurred *after* the interrogation.[68] No one factor is dispositive, and courts must assess the relative importance of these factors on a case-by-case basis.[69] Appellate courts apply *de novo* review to the ultimate *Miranda* custody determination.[70]

In this case, some of the factors support a finding that Macasaet was not in custody during the execution of the search warrant. Macasaet voluntarily drove himself to the police station and agreed to be interviewed in advance.[71] When the interview began, Macasaet was positioned in the chair closest to the door, and Dunford "took pains to make sure Macasaet knew the door was unlocked and that he could leave at any time."[72] The interview itself was "non-accusatory, polite and respectful," and Dunford and Macasaet "interacted convivially" while Dunford executed the warrant.[73] The police never displayed or threatened force, and Macasaet was seized for the limited purpose of "collect[ing] the specimens the search warrant authorized." After the evidence was collected, Dunford again told Macasaet that he was free to leave, and after

---

[68]  *Hunter*, 590 P.2d at 895.

[69]  *Smith*, 38 P.3d at 1154-55; *Hunter*, 590 P.2d at 895.

[70]  *Smith*, 38 P.3d at 1153.

[71]  *See Beltz v. State*, 895 P.2d 513, 520 (Alaska App. 1995) (indicating that if the defendant initiates contact with the police, that factor weighs against custody); *State v. Murray*, 796 P.2d 849, 851 (Alaska App. 1990); *cf. State v. Cassell*, 602 P.2d 410, 414-15 (Alaska 1979) (concluding that the defendant was in custodial interrogation because he did not go to the police station on his own initiative but was driven in a patrol car).

[72]  *See Smith,* 38 P.3d at 1157 (the police indicating to a defendant they are free to leave anytime is generally a factor that weighs against custody).

[73]  *Long v. State*, 837 P.2d 737, 743 (Alaska App. 1992) (non-accusatory questioning conducted in a manner that is "low-key, not heavy-handed" is a factor that weighs against custody).

conducting further questioning of Macasaet, Dunford returned the phone to him. Macasaet was not arrested until a week later, on August 9, 2016.[74]

However, many other factors support a finding of custody. When the interview began, Macasaet was aware that he was a suspect.[75] Macasaet was interviewed at the police station by two law enforcement officers, one of whom was wearing his full uniform.[76] Before collecting evidence from Macasaet, Dunford confiscated Macasaet's nephew's cell phone.[77] Dunford also informed Macasaet that he was not free to leave while the "really invasive" warrant was executed (a process that required Macasaet to submit to the exposure and swabbing of his genitals and combing and plucking of his pubic hair). After the evidence collection concluded, Dunford did not return the cell phone and he refused to update Macasaet on when, or if, it would be returned. Instead, Dunford continued questioning Macasaet about Guthrie, and he did not return the phone until after the questioning was finished.

Weighing these factors *de novo*, we conclude that Macasaet would not have felt free to leave during the execution of the warrant. Macasaet was temporarily detained at the police station while the police swabbed and photographed his genitals and combed and plucked his pubic hair. This type of body search necessarily would cause a person to feel vulnerable and ashamed, amplifying the coercive nature of a simultaneous police interrogation. Such a process creates a restraint on the freedom of

---

[74] *Smith*, 38 P.3d at 1159 (the release of a person after the interview weighs against custody, but this factor is given "limited weight").

[75] *Id.* at 1158-59 (questioning a subject as a suspect and suggesting that they are guilty is a factor that weighs in favor of custody).

[76] *Id.* at 1156 (interviews at the police stations or patrol vehicles are generally more custodial than other locations, a factor that weighs in favor of custody).

[77] *Rockwell v. State*, 215 P.3d 369, 373-74 (Alaska App. 2009) (suggesting, without deciding, that when a police officer holds onto a suspect's keys during an interview, that factor weighs in favor of custody).

a defendant's movements that is commensurate with a formal arrest.[78] For these reasons, we conclude that Macasaet was in custody during the execution of the search warrant and should have been given *Miranda* warnings.

We next consider whether Macasaet remained in custody when he responded to additional questions asked by Dunford, after the search was concluded but before the officers returned the cell phone they had taken from him. As we have explained, after the search process was complete, Dunford told Macasaet that he could leave at any time. But Dunford did not return the cell phone he had taken from Macasaet or indicate when it would be returned. And when Macasaet asked Dunford if he could get the cell phone back, Dunford responded that he needed to discuss the phone issue with his colleague, and that he would "kick [Macasaet] loose" afterwards. Dunford did not tell Macasaet when the phone would be returned. Rather, Dunford told Macasaet, "we'll get to that," and continued asking him questions about Guthrie in order to "recap" what Macasaet had previously told him. During the questioning, not only did the officers retain the cell phone, they also withheld their decision regarding whether they would give it back.

Macasaet argues that, during this additional questioning, he continued to be in custody and that the prior questioning without *Miranda* warnings tainted this continued interrogation. We agree.

---

[78] *See United States v. Turner*, 761 A.2d 845, 850-53 (D.C. Cir. 2000) (concluding that an interrogation that had been non-custodial turned custodial, for purposes of issuing *Miranda* warnings, when the police advised the defendant they had a warrant authorizing them to take samples "of his blood, saliva, and head and pubic hair"); *United States v. McCain*, 556 F.2d 253, 255 (5th Cir. 1977) (concluding that the defendant was in *Miranda* custody while she was being strip searched, and that she remained in custody after the strip search while her luggage was being re-examined); *United States v. Daubmann*, 474 F. Supp.2d 228, 234 (D. Mass. 2007) (describing the defendant's "humiliating state of undress" during the interview as one factor supporting custody).

A person in Macasaet's position, who had just been subjected to a temporary seizure to conduct a highly invasive body search, would reasonably conclude that, despite the officers' statements to the contrary, he was not actually free to leave. This perception would be amplified by the officers' exercise of authority over the cell phone, a valuable item of personal property, and their refusal to discuss its return until after Macasaet had answered additional questions.[79] Similarly, Dunford's comment that Macasaet would be "kicked loose" later, after Dunford had spoken with his colleagues about the phone, would have suggested to a reasonable person that they were not free to leave during Dunford's questioning of them. These circumstances amounted to *Miranda* custody, and the inherent pressures of this situation could have compelled Macasaet to speak against his will.

For these reasons, we conclude that Macasaet was subject to custodial interrogation beginning when Dunford executed the search warrant and continuing until the police station interview ended. *Miranda* warnings should have been given before Dunford pursued additional interrogation during the execution of the search warrant. Because warnings were not given, the court should have suppressed all of the statements Macasaet subsequently made in response to police questioning.

We nevertheless conclude that the admission of Macasaet's un-*Mirandized* statements to Dunford was harmless beyond a reasonable doubt in the context of Macasaet's trial.[80] Critically, the statements in question were cumulative of other evidence admitted at trial, including statements Macasaet made in over a dozen conversations he had with law enforcement officers on July 31 and statements he made

---

[79] *See Rockwell*, 215 P.3d at 373-74 (suggesting, without deciding, that when a police officer holds onto a suspect's keys during an interview, that factor weighs in favor of custody).

[80] *Motta v. State*, 911 P.2d 34, 39-40 (Alaska App. 1996) (concluding that the defendant's testimony at trial presented a version of events that paralleled those from his tainted confession, rendering harmless the jury's consideration of those facts).

in the first hour of his August 2 interview at the police station, prior to the execution of the warrant. Under these circumstances, the admission of the portion of the interview that occurred during the search and immediately after it would not have had any impact on the jury's verdict.

We accordingly conclude that the error in denying the motion to suppress was harmless beyond a reasonable doubt.

*The superior court did not abuse its discretion by denying Macasaet's motion for a mistrial*

Macasaet argues that the superior court erred by denying his motion for a mistrial after Trooper Benjamin Mank testified that Macasaet did not show "genuine emotion" when discussing Guthrie's death. We begin by explaining the procedural posture of this claim in more detail.

Midway through trial, Macasaet moved for a protective order to limit Mank's testimony. After listening to the prosecutor's opening statement, Macasaet was concerned that Mank's testimony might extend beyond his observations, which were permissible evidence, to his opinion about how "an innocent man" in Macasaet's position should have acted, which was impermissible. The prosecutor agreed that Mank could testify about what he observed, but had to refrain from offering his opinion on whether Macasaet acted guilty or innocent. The court granted the protective order under the parameters agreed to by the parties.

The State called Mank to testify during its case-in-chief. On July 31, Mank interviewed Macasaet shortly after Macasaet reported finding Guthrie's body. While Mank was on the stand, the State admitted and published a recording of this interview. After Macasaet began audibly crying on the recording, the prosecutor paused the recording and asked Mank whether he had observed tears in Macasaet's eyes. In response, Mank testified that those tears were the only time that he saw Macasaet show "genuine emotion":

*Prosecutor*: All right. And when you were speaking with [Macasaet], did you see any tears in his eyes?

*Mank*: Only the moment when he started asking about what should he tell his boys. That's the only time I saw any tears, or what I would say *genuine emotion*.

*Prosecutor*: And did you see any snot come out of his nose?

*Mank*: No.

(Emphasis added)

Macasaet's attorney did not immediately object to this testimony. Rather, he waited until the jury was next excused and then moved for a mistrial. The defense attorney argued that by stating that Macasaet only showed genuine emotion when he discussed his children, Mank had implied that Macasaet either showed no emotion, or non-genuine emotion, when discussing Guthrie's death.

The prosecutor agreed that Mank's testimony was error. However, he noted that the error was "fleeting" and hard to discern — so much so that the superior court did not notice the error when it occurred. The prosecutor urged the court to deny the mistrial, but grant whatever curative instruction the defense requested.

The court found that Mank's testimony was improper. But the court denied Macasaet's motion for a mistrial, finding that Macasaet could still have a fair trial if curative actions were taken. The judge then ordered the curative measures that Macasaet requested, including striking not only Mank's improper testimony from the record but also the remainder of his testimony about Macasaet's appearance. Macasaet asked the court not to provide a curative instruction to the jury, so the court did not order one.

On appeal, Macasaet argues that the court erred in declining to order a mistrial. "The question of whether a particular mistake or occurrence requires a mistrial is entrusted to the trial judge's discretion, and an appellate court will reverse the trial

judge's decision only if the judge has abused that discretion."[81] When a mistrial is requested because improper testimony was admitted at trial, "[a] timely curative instruction is presumed to remedy the unfair prejudice that might otherwise arise from inadmissible testimony."[82] However, even if timely curative actions are taken, a mistrial may still be warranted in the interests of justice.[83]

This Court has repeatedly cautioned that witnesses may not function as "human polygraphs" by offering their opinion on whether another witness's statement was truthful.[84] The risk of prejudice is particularly acute when the witness is a police officer.[85] This is because jurors may "surmise that the police are privy to more facts than have been presented in court, or they may be improperly swayed by the opinion of a witness who is presented as an experienced criminal investigator."[86]

Here, Mank's testimony was not only improper, but had the imprimatur of authority coming from a police officer. Mank's testimony suggested that Macasaet either was unemotional or had feigned emotion when discussing Guthrie's death. A

---

[81]  *Hewitt v. State*, 188 P.3d 697, 699 (Alaska App. 2008).

[82]  *Hamilton v. State*, 59 P.3d 760, 769 (Alaska App. 2002).

[83]  *Douglas v. State*, 214 P.3d 312, 326 (Alaska 2009) (noting that "a defendant may not be retried for the same offense unless he has consented to a mistrial or there was manifest necessity for granting a mistrial" and that manifest necessity requires that "the ends of public justice would not be served by a continuation of the proceedings").

[84]  *Kim v. State*, 390 P.3d 1207, 1209 (Alaska App. 2017); *see also Thompson v. State*, 769 P.2d 997, 1003-04 (Alaska App. 1989); *Flynn v. State*, 847 P.2d 1073, 1076 (Alaska App. 1993); *Sakeagak v. State*, 952 P.2d 278, 282 (Alaska App. 2008).

[85]  *Sakeagak*, 952 P.2d at 282 (expressing particular danger when a law enforcement officer testifies about a defendant's guilt because jurors may assume that police know more information than was presented in court, and jurors may credit their experience); *see also Kim*, 390 P.3d at 1209-10.

[86]  *Sakeagak*, 952 P.2d at 282.

reasonable inference from this testimony was that Macasaet was not acting appropriately sad after learning of his girlfriend's death (from which the jury could infer that Mank believed that Macasaet was guilty).[87]

But while Mank's testimony was clearly improper, we find that the superior court did not abuse its discretion by not ordering a mistrial. Mank's testimony was fleeting, stricken from the record, and not referenced again by the parties. The superior court ordered every other curative measure that Macasaet requested, and it went even further by striking not only the improper testimony but also the remainder of Mank's testimony about Macasaet's appearance.

Had Mank's testimony been central to the State's evidence of guilt, these curative actions may have been insufficient to ensure a fair trial. But in the broader context of the State's case, Mank's testimony was peripheral to the State's evidence of guilt. At trial, the State introduced audio recordings of Macasaet's police contacts; geolocation data, text messages, and call logs from Macasaet's cell phone; evidence that Macasaet had twice strangled Guthrie; and testimony about witnesses who interacted with Macasaet before and after Guthrie's death. In its closing argument, the prosecutor's theory of guilt emphasized Macasaet's history of strangling Guthrie, the location of Guthrie's body, the suspicious circumstances under which Macasaet located the body, and Macasaet's inconsistent statements to the police that minimized his potential involvement in the crime. Further, the prosecutor's closing argument did not mention Mank's testimony about Macasaet's emotional appearance (in compliance with the court's directive). Given this context, the superior court did not abuse its discretion by denying Macasaet's motion for mistrial.

In his appellate briefing, Macasaet argues that when the police *intentionally* violate a protective order, we should not apply our established framework for analyzing mistrial claims. Instead, he urges us to "begin [our analysis] with the

---

[87] *Id.*; *Flynn*, 847 P.2d at 1075-76; *Thompson*, 769 P.2d at 1003-04.

presumption that a mistrial is appropriate." However, Macasaet never asked the superior court to determine whether Mank violated the protective order intentionally (as opposed to recklessly or negligently). Consequently, the court never made such a finding. Thus, even if we were to adopt Macasaet's alternative analysis, he has not shown that it should be applied to the circumstances of this case.

*Conclusion*

The judgment of the superior court is AFFIRMED.